Slip Op. 22–155

UNITED STATES COURT OF INTERNATIONAL TRADE

————————————————————————

FUSONG JINLONG WOODEN GROUP CO.,
LTD. ET AL.,

               Plaintiffs,

YIHUA LIFESTYLE TECHNOLOGY CO., LTD.
ET AL.,

            Consolidated Plaintiffs,

       and

LUMBER LIQUIDATORS SERVICES, LLC
ET AL.,

           Plaintiff-Intervenors,

       v.

UNITED STATES,

          Defendant,

       and

AMERICAN MANUFACTURERS OF
MULTILAYERED WOOD FLOORING,

          Defendant-Intervenor.

————————————————————————

Before: Richard K. Eaton, Judge

Consol. Court No. 19-00144

## OPINION AND ORDER

[U.S. Department of Commerce's final results are sustained in part, and remanded.]

Dated: December 22, 2022

    *Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiffs Fusong Jinlong Wooden Group Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., and Dalian Qianqiu Wooden Product Co., Ltd. With her on the brief was *Gregory S. Menegaz* and *J. Kevin Horgan*.

*Daniel M. Witkowski* and, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, D.C., argued for Consolidated Plaintiff Sino-Maple (Jiangsu) Co., Ltd. With him on the brief was *Matthew R. Nicely* and *Dean A. Pinkert*, Hughes, Hubbard & Reed LLP, of Washington, D.C.

*David J. Craven*, Craven Trade Law LLC, of Chicago, IL, argued for Consolidated Plaintiffs Huzhou Chenghang Wood Co., Ltd., Hangzhou Hanje Tec Co., Ltd., Hunchun Xingjia Wooden Flooring Inc., Dunhua Shengda Wood Industry Co., Ltd., Zhejiang Fuerjia Wooden Co., Ltd., A&W (Shanghai) Woods Co., Ltd., and Dun Hua Sen Tai Wood Co., Ltd.

*Adams C. Lee*, Harris Bricken McVay Sliwoski LLP, of Seattle, WA, present but did not argue for Consolidated Plaintiff Zhejiang Dadongwu GreenHome Wood Co., Ltd.

*Lizbeth Mohan*, Fox Rothschild LLP, of Washington, D.C., argued for Consolidated Plaintiff Baishan Huafeng Wooden Product Co. With her on the brief were *Ronald M. Wisla* and *Brittney R. Powell*.

*Kavita Mohan*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for Consolidated Plaintiff Scholar Home (Shanghai) New Material Co., Ltd. With her on the brief were *Elaine F. Wang*, *Francis J. Sailer*, *Ned H. Marshak*, and *Jordan C. Kahn*.

*Sarah M. Wyss* and *Jill A. Cramer*, Mowry & Grimson, PLLC, of Washington, D.C., present but did not argue for Consolidated Plaintiff Yihua Lifestyle Technology Co., Ltd. Of counsel on the brief was *John R. Magnus*, TradeWins LLC, of Washington, D.C.

*Gregory S. McCue* and *Adriana M. Campos-Korn*, Steptoe & Johnson, LLP, of Washington, D.C., present but did not argue for Consolidated Plaintiffs Struxtur, Inc. and Evolutions Flooring, Inc.

*Mark R. Ludwikowski*, Clark Hill PLC, of Washington, D.C., argued for Plaintiff-Intervenor Lumber Liquidators Services, LLC. With him on the brief were *William C. Sjoberg* and *Courtney G. Taylor*.

*Sonia M. Orfield*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *Rachel A. Bogdan*, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

*Stephanie M. Bell*, Wiley Rein LLP, of Washington, D.C. argued for Defendant-Intervenor American Manufacturers of Multilayered Wood Flooring. With her on the brief were *Timothy C. Brightbill*, *Maureen E. Thorson*, and *Tessa V. Capeloto*.

Eaton, Judge: This consolidated case involves the final results of the U.S. Department of Commerce's ("Commerce" or the "Department") sixth administrative review of the antidumping duty order on multilayered wood flooring from the People's Republic of China ("China") covering the period of December 1, 2016, through November 30, 2017. *See Multilayered Wood Flooring From the People's Republic of China*, 84 Fed. Reg. 38,002 (Dep't Commerce Aug. 5, 2019) ("Final Results") and accompanying Issues and Decision Mem. (July 29, 2019), PR 484 ("Final IDM").

Before the court are twelve pending motions for judgment on the agency record by which Plaintiffs Fusong Jinlong Wooden Group Co., Ltd. et al. ("Fusong"), Consolidated Plaintiffs Sino-Maple (Jiangsu) Co., Ltd. ("Sino-Maple"), Metropolitan Hardwood Floors, Inc. et al. ("Metropolitan Hardwood"), Huzhou Chenghang Wood Co., Ltd. et al. ("Huzhou"), Zhejiang Dadongwu GreenHome Wood Co., Ltd. ("GreenHome"), Yihua Lifestyle Technology Co., Ltd. ("Yihua"), Linyi Anying Co., Ltd. and Linyi Youyou Co., Ltd. (collectively, "Linyi"), Struxtur, Inc. and Evolutions Flooring, Inc. (collectively, "Struxtur"), Scholar Home (Shanghai) New Material Co., Ltd. ("Scholar Home"), Baishan Huafeng Wooden Product Co. ("Baishan Huafeng"), together with Plaintiff-Intervenors Benxi Wood Company et al. ("Benxi Wood") and Lumber Liquidators Services, LLC ("Lumber Liquidators"), challenge several aspects of Commerce's Final Results as unsupported by substantial evidence and not in accordance with law. *See* Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 51-2 ("Fusong's Br.");[1] Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 57 ("Sino-Maple's Br."); Consol. Pls.' Mem. Supp. Mot. J.

---

[1]     A single brief was submitted on behalf of Fusong Jinlong Wooden Group Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., and Dalian Qianqiu Wooden Product Co., Ltd.

Agency R., ECF No. 59-2 ("Metropolitan Hardwood's Br.");[2] Consol. Pls.' Mem. Supp. Mot. J.

Agency R., ECF No. 50-1 ("Huzhou's Br.");[3] Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF

No. 56-2 ("GreenHome's Br."); Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 47-2

("Yihua's Br."); Consol. Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 53 ("Linyi's Br.");[4]

Consol. Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 52 ("Struxtur's Br.");[5] Consol. Pl.'s Mem.

Supp. Mot. J. Agency R., ECF No. 48 ("Scholar Home's Br."); Consol. Pl.'s Mem. Supp. Mot. J.

Agency R., ECF No. 60-2 ("Baishan Huafeng's Br."); Pl.-Ints.' Mem. Supp. Mot. J. Agency R.,

ECF No. 55-2 ("Benxi Wood's Br.");[6] Pl.-Int.'s Mem. Supp. Mot. J. Agency R., ECF No. 54-2

("Lumber Liquidators' Br.").

---

[2]      A single brief was submitted on behalf of Metropolitan Hardwood Floors, Inc., Nakahiro Jyou Sei Furniture (Dalian) Co., Ltd., Shenyang Haobainian Wooden Co., Ltd., Cohesion Trading Limited, Galleher Corp., Galleher LLC, MGI International, Mobetta Trading Limited, and Wego International Floors LLC.

[3]      A single brief was submitted on behalf of Huzhou Chenghang Wood Co., Ltd., Hangzhou Hanje Tec Co., Ltd., Hunchun Xingjia Wooden Flooring Inc., Dunhua Shengda Wood Industry Co., Ltd., Zhejiang Fuerjia Wooden Co., Ltd., A&W (Shanghai) Woods Co., Ltd., and Dun Hua Sen Tai Wood Co., Ltd.

[4]      The Linyi brief states only that it "incorporate[s] herein by reference and in full the arguments and the requests for relief as presented in the motions and briefs filed by all other plaintiffs and plaintiff-intervenors in this proceeding." Linyi's Br. at 2. As such, this brief is not further discussed herein.

[5]      The Struxtur brief states only that it "incorporate[s] herein by reference and in full the arguments and the requests for relief as presented in the motions and briefs filed by all other plaintiffs and plaintiff-intervenors in this proceeding." Struxtur's Br. at 2. As such, this brief is not further discussed herein.

[6]      A single brief was submitted on behalf of Benxi Wood Company, Dalian Jiahong Wood Industry Co., Ltd., Dalian Kemian Wood Industry Co., Ltd., Dongtai Fuan Universal Dynamics, LLC, HaiLin LinJing Wooden Products Co., Ltd., Jiangsu Guyu International Trading Co., Ltd., Jiangsu Mingle Flooring Co., Ltd., Jiangsu Simba Flooring Co., Ltd., Jiashan HuiJiaLe Decoration Material Co., Ltd., Kemian Wood Industry (Kunshan) Co., Ltd., Suzhou Dongda Wood Co., Ltd., and Tongxiang Jisheng Import and Export Co., Ltd.

Defendant the United States, on behalf of Commerce, and Petitioner and Defendant-Intervenor American Manufacturers of Multilayered Wood Flooring ("American Manufacturers" or "Petitioner") oppose the motions. *See* Def.'s Resp. Pls.' Mots. J. Agency R., ECF No. 70 ("Def.'s Resp. Br."); Def.-Int.'s Resp. Pls.' Mots. J. Agency R., ECF No. 69 ("Def.-Int.'s Resp. Br.").

For the reasons below, the court sustains the Department's decision to use adverse facts available ("AFA") in determining Sino-Maple's dumping margin as supported by substantial evidence and in accordance with law. The court also sustains Commerce's separate rate eligibility determinations as supported by substantial evidence and in accordance with law. The court cannot sustain, however, the method Commerce used to determine Sino-Maple's AFA rate—*i.e.*, by selecting the highest transaction-specific margin on the record—because it is not in accordance with law.

Thus, on remand, Commerce shall reconsider the method used to select an AFA rate for Sino-Maple in a manner that complies with this Opinion and Order, and the statute, 19 U.S.C. § 1677e(d).[7] Since the remaining issues are contingent upon the outcome of Commerce's redetermination of Sino-Maple's rate on remand, the court reserves decision on these issues[8] until the results of redetermination are before the court.

---

[7]     All references to the U.S. Code are to the 2018 edition, unless otherwise noted.

[8]     The issues on which the court reserves decision are: (1) whether Commerce's inclusion of Sino-Maple's AFA rate in the calculation of the separate rate is supported by substantial evidence and in accordance with law; (2) whether Commerce's method in calculating the separate rate is reasonable under 19 U.S.C. § 1673d(c)(5)(B); (3) whether the separate rate is aberrational and not reflective of the separate rate respondents' potential dumping margins; and (4) whether Commerce's use of a rate, based entirely on AFA, in calculating the separate rate for the fully cooperative separate rate respondents, violates the excessive fines clause of the Eighth Amendment.

## BACKGROUND

**I.    Commerce's Adverse Facts Available Determination**

On December 4, 2017, Commerce issued a notice of opportunity to request an administrative review for the antidumping duty order on multilayered wood flooring from China. *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 82 Fed. Reg. 57,219, 57,220 (Dep't Commerce Dec. 4, 2017).

On March 7, 2018, Commerce placed on the administrative record U.S. Customs and Border Protection ("Customs") data for mandatory respondent[9] selection purposes. *See* Release of U.S. Customs and Border Protection Data Mem. (Mar. 7, 2018), PR 40. Based on this data, Commerce initially selected Jiangsu Senmao Bamboo and Wood Industry Co., Ltd. ("Senmao") and Fine Furniture (Shanghai) Limited ("Fine Furniture")—the two largest exporters[10] of the

---

[9]    Generally, Commerce determines an "individual weighted average dumping margin for each known exporter and producer of the subject merchandise." 19 U.S.C. § 1677f-1(c)(1). Commerce, however, may limit individual examination to mandatory respondents (*i.e.*, "exporters and producers accounting for the largest volume of the subject merchandise from the exporting country") when the "large number of exporters or producers involved in the investigation" makes it impracticable for Commerce to calculate an individual margin for each one. *Id.* § 1677f-1(c)(2).

[10]    "Commerce's practice has devolved to the point where it regularly chooses only two (and sometimes one) mandatory respondents to be 'representative' of unexamined respondents for the purpose of calculating the [separate] rate in a review, a [practice] that this Court has regarded with some skepticism." *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1236 (2021) (footnote omitted) (first citing *Zhejiang Native Produce & Animal By-Prods. Imp. & Exp. Corp. v. United States*, 33 CIT 1125, 637 F. Supp. 2d 1260 (2009); and then citing *Carpenter Tech. Corp. v. United States*, 33 CIT 1721, 662 F. Supp. 2d 1337 (2009)). "There can be little question that, if Commerce were to change its method and name more than two mandatory respondents, separate rate companies would receive more accurate rates, and a great deal of litigation would be avoided." *Xiping Opeck Food Co. v. United States*, 45 CIT __, __, 551 F. Supp. 3d 1339, 1356-57 (2021). The Federal Circuit has expressed similar concerns. *See, e.g.*, *YC Rubber Co. (N. Am.) LLC v. United States*, 2022 WL 3711377, at *3-4

subject wood flooring—as mandatory respondents. *See* Mandatory Respondent Selection Mem. (June 19, 2018) at 8, PR 258, CR 159.

On July 30, 2018, Commerce issued an additional mandatory respondent memorandum stating its intention to rescind the review with respect to Fine Furniture and to select Sino-Maple— the next largest exporter—as a mandatory respondent in its place. *See* Selection of Additional Mandatory Respondent Mem. (July 30, 2018) at 2-3, PR 276.

On July 31, 2018, Commerce issued an initial antidumping questionnaire to Sino-Maple. *See* Sino-Maple Antidumping Quest. (July 31, 2018), PR 278. Sino-Maple timely filed its responses, providing Commerce with, *inter alia*, information regarding its U.S. sales during the period of review. *See* Sino-Maple's Resp. Sec. A Quest. (Sept. 4, 2018), PR 298, 299; *see also* Sino-Maple's Resp. Secs. C & D Quest. (Sept. 13, 2018), PR 302, CR 190-202. After considering the responses and identifying a potentially relevant relationship between Sino-Maple and a U.S. affiliate—Alpha Floors, Inc.—on October 17, 2018, Commerce issued a supplemental questionnaire asking Sino-Maple to "explain [its] relationship with Alpha Floors, including whether Alpha Floors assists Sino-Maple with finding U.S. customers and/or facilitating the sale of subject merchandise." Sino-Maple First Suppl. Quest. (Oct. 17, 2018) ("First Suppl. Quest.") at 4, PR 351, CR 229. Sino-Maple responded that Alpha Floors, an affiliated company, "assist[ed it] with finding U.S. customers and facilitating the sales of subject merchandise in the United States at times during the [period of review]." Sino-Maple's Resp. First Suppl. Quest. (Nov. 5, 2018) at 5, PR 376, CR 242-44.

---

(Fed. Cir. Aug. 29, 2022) (not reported in the Federal Reporter) (holding that "Commerce unlawfully restricted its examination to a single respondent" under 19 U.S.C. § 1677f-1(c)(2)).

Several days later, Commerce issued a second supplemental questionnaire asking Sino-Maple to clarify certain aspects of its prior responses regarding its relationship with Alpha Floors. *See* Sino-Maple Second Suppl. Quest. (Nov. 9, 2018) ("Second Suppl. Quest."), PR 378, CR 252. Commerce noted that Sino-Maple's sales reconciliation indicated that the company had, in fact, made sales to its U.S. affiliate Alpha Floors during the period of review.[11] *See* Second Suppl. Quest. at 3. Sino-Maple, however, initially reported making sales to only two unaffiliated U.S. customers.

The inconsistencies in Sino-Maple's reporting led Commerce to believe that Alpha Floors was a U.S. customer of Sino-Maple. Thus, on November 9, 2018, Commerce notified Sino-Maple that, if Alpha Floors sold subject wood flooring to unaffiliated U.S. customers during the period of review, then Sino-Maple should revise its sales database to include these sales. *See* Second Suppl. Quest. at 3. The idea here was that if U.S. affiliate, Alpha Floors, sold Sino-Maple's products to an unaffiliated company in the United States, then these sales should be reported as constructed export price sales under the statute. *See* 19 U.S.C. § 1677a(b) (constructed export price is "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States . . . by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter").

In response to Commerce's second supplemental questionnaire, Sino-Maple reported that there were sales of subject merchandise originally reported as export price sales[12] (*i.e.*, sales to an

---

[11]    Sino-Maple's sales reconciliation reflected 1,710,572 Renminbi in sales to Alpha Floors during the period of review and Sino-Maple's 2016 and 2017 audited financial statements indicated 1,856,771 Renminbi in "major transactions" with Alpha Floors. Second Suppl. Quest. at 3.

[12]    "Export price" means

unaffiliated third party) that the company now believed should have been reported as constructed export price sales[13] (*i.e.*, sales to an affiliated entity, such as Alpha Floors). *See* Sino-Maple's Resp. Second Suppl. Quest. (Nov. 16, 2018), PR 383, CR 254. That is, for these sales, Sino-Maple sold subject wood flooring directly to Alpha Floors, which then sold the subject wood flooring to an unaffiliated third-party purchaser.[14] Sino-Maple explained that the sales were initially misreported as export price sales, rather than constructed export price sales, because the company "did not understand that such sales would be considered [constructed export price] sales when its affiliated company, Alpha Floors, Inc., was not the importer of record." *See* Sino-Maple's Partial Ext. Req. (Nov. 14, 2018) ("Ext. Req.") at 2, PR 380, CR 253.

Sino-Maple also reported another sale made through Alpha Floors that had not been accounted for in its original reporting because the company mistakenly believed that sale to be outside the period of review. *See* Sino-Maple's Resp. Second Suppl. Quest. at 1.

---

the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

19 U.S.C. § 1677a(a).

[13]     "Constructed export price" means

the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise *or by a seller affiliated with the producer* or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

19 U.S.C. § 1677a(b) (emphasis added).

[14]     There were four sales of subject merchandise originally misreported as export price sales. *See* Sino-Maple's Resp. Second Suppl. Quest. at 1.

While Sino-Maple timely provided its responses to Commerce's questions in the second supplemental questionnaire, the company requested an extension of time to report additional U.S. sales information. *See* Ext. Req. at 2-3. That is, after reviewing certain sales with its counsel, Sino-Maple wished to report additional imports into the United States by Alpha Floors of multilayered wood flooring from a third-country manufacturer as constructed export price sales. *See* Ext. Req. at 2-4.

These third-country imports were not sales of multilayered wood flooring from Sino-Maple to Alpha Floors that were resold to unaffiliated U.S. customers. Rather, they were sales of multilayered wood flooring finished by a third-country manufacturer using plywood cores supplied by Sino-Maple.[15] *See* Ext. Req. at 2-4.

Apparently, the unaffiliated third-country manufacturer used the plywood cores it purchased from Sino-Maple to produce multilayered wood flooring, and then sold that wood flooring to Sino-Maple's sister company, Alpha Floors. *See* Ext. Req. at 3, Exs. 1 & 3. Alpha Floors then entered the merchandise in the United States as multilayered wood flooring from the third country. *See* Ext. Req. at 2-3. Sino-Maple maintained that it did not report these sales previously because it believed the merchandise in question was multilayered wood flooring from the third country and therefore not subject to the antidumping review covering multilayered wood flooring from China. *See* Ext. Req. at 2-3. According to Sino-Maple, the final results of a separate Customs proceeding[16] led it to reconsider whether the imports of multilayered wood flooring by

---

[15]        Sino-Maple sold its plywood cores to Paladin Lake (Cambodia) Wood Industry Co., Ltd., an unaffiliated factory in Cambodia. *See* Ext Req. at 3.

[16]        The separate Customs proceeding was a Generalized System of Preferences verification related to Alpha Floors' entry of multilayered wood flooring from Cambodia. *See* Ext. Req. at 3.

Alpha Floors from the third-country manufacturer were relevant to the review of multilayered wood flooring from China.

As part of the separate proceeding, Customs contacted Alpha Floors and asked for information regarding one of the company's entries of multilayered wood flooring from the third-country manufacturer. Alpha Floors responded to Customs' inquiries in February and March 2018. *See* Ext. Req. at 2-3. On September 5, 2018, Alpha Floors received a notice of action from Customs proposing to treat its entry as merchandise of Chinese origin, rather than from the third country. *See* Ext. Req., Ex. 1. The notice also stated that the merchandise would be subject to antidumping duties in the present review. *See* Ext. Req., Ex. 1. Alpha Floors disputed Customs' preliminary determination and argued that the entries were properly entered as merchandise from the third country and, therefore, should not be reclassified as merchandise from China. Nevertheless, on November 7, 2018, Customs informed Alpha Floors that, after further review, it was still Customs' position that Alpha Floors' entry would be considered merchandise of Chinese origin. *See* Ext. Req., Ex. 3.

On November 14, 2018, Sino-Maple asked for an extension of time, which it said would give it an opportunity to provide Commerce with information regarding the shipments of multilayered wood flooring made in the third country, using Sino-Maple's plywood cores, and imported by Alpha Floors. The company stated that it was convinced that these sales were now subject to antidumping duties in this review. *See* Ext. Req. Sino-Maple asked for an extension until December 17, 2018—the deadline by which Commerce was to issue the preliminary decision memorandum. *See* Ext. Req. at 4. Commerce denied Sino-Maple's request "due to the time constraints in [the] proceeding." *See* Denial Sino-Maple Partial Ext. Req. (Nov. 16, 2018) ("Ext. Req. Denial"), PR 385.

Importantly, questions related to Commerce's denial of Sino-Maple's extension request have not been raised before the court.[17] The extension request is relevant, however, because it is when Sino-Maple first made Commerce aware of the unreported third-country sales.

Sino-Maple provided the total quantity and value for the imports by Alpha Floors from the third-country manufacturer in its November 16, 2018, response to Commerce's second supplemental questionnaire. *See* Sino-Maple's Resp. Second Suppl. Quest. at 4. Sino-Maple did not, however, supply the individual sales information necessary for Commerce to calculate the constructed export price (U.S. sales price) of the company's products.

Commerce issued its Preliminary Decision Memorandum on December 17, 2018, in which it determined a zero percent dumping margin for Senmao[18] and a margin of 96.51 percent for Sino-Maple. *See Multilayered Wood Flooring From the People's Republic of China*, 83 Fed. Reg. 65,630, 65,631 (Dep't Commerce Dec. 21, 2018) ("Preliminary Results") and accompanying

---

[17]     Sino-Maple argued in its case brief, before Commerce, that the Department abused its discretion when it denied the company's request for an extension of time to file additional information related to the third-country transactions involving its U.S. affiliate, Alpha Floors. *See* Sino-Maple's Case Br. (Mar. 4, 2019) at 4, PR 440, CR 277. Sino-Maple, however, did not raise this argument in its briefs before the court and has therefore forfeited this argument. *See Beijing Tianhai Indus. Co. v. United States*, 41 CIT __, __, 234 F. Supp. 3d 1322, 1330 (2017) ("[A]rguments not raised in the opening brief are waived." (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006))).

GreenHome, a separate rate respondent, did not raise the issue of Sino-Maple's request for an extension of time in its case brief before Commerce, but now argues before the court that "[t]he Department's refusal to allow Sino-Maple to submit additional information regarding its U.S. affiliate[']s importations from a third-country was arbitrary and an abuse of discretion." GreenHome's Br. at 5. Beyond this, there is nothing in GreenHome's brief that directly addresses how Commerce abused its discretion and GreenHome does not develop its argument beyond this single assertion. Under these circumstances, the court deems this issue waived. *See United States v. Great Am. Ins. Co.*, 738 F.3d 1320, 1328 (Fed. Cir. 2013) ("It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived.").

[18]     Senmao does not dispute its assigned zero percent dumping margin and is not a party to this lawsuit.

Preliminary Decision Mem. (Dec. 17, 2018) ("PDM") at 1, 16, PR 403. Sino-Maple's margin was

based entirely on AFA.[19] *See* Preliminary Results, 83 Fed. Reg. at 65,631.

## II.     Commerce's Determination of the Separate Rate

Commerce also preliminarily determined that many of the Chinese exporters and/or

producers not selected for individual review were eligible for a separate rate by demonstrating *de*

*jure* and *de facto* independence from the Chinese government (the "Separate Rate Companies"[20]).

In other words, these companies had rebutted the Department's nonmarket economy

presumption[21] that they were controlled by the Chinese government.

Pursuant to the statute, Commerce determines the estimated separate rate by taking a

"weighted average of the estimated weighted average dumping margins established for exporters

---

[19]     Under the statute, Commerce may use "facts otherwise available" when necessary information is missing from the record. *See* 19 U.S.C. § 1677e(a). The statute also permits Commerce to make a separate finding to use adverse inferences when selecting from among the facts available if "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce]." *Id.* § 1677e(b).

[20]     Commerce preliminarily determined that sixty-one companies had demonstrated eligibility for a separate rate. Out of those sixty-one companies, only Fusong, Metropolitan Hardwood, Huzhou, GreenHome, Yihua, Linyi, Struxtur, and Benxi Wood are parties to this action.

[21]     "Over the years, Commerce has developed an administrative practice of applying a rebuttable presumption that all companies within a nonmarket economy country are controlled by the government of that country, *i.e.*, the 'NME Policy.'" *Jilin*, 45 CIT at __, 519 F. Supp. 3d at 1239. As part of its NME Policy, Commerce presumes that all Chinese exporters are part of the "NME Entity," a single country-wide concept employed by the Department as a sort of legal fiction. The NME Entity is neither "China" nor the "Chinese government," but rather consists of all the Chinese exporters and producers of subject merchandise. As noted, this policy has been open to question. *See id.*, 45 CIT at __, 519 F. Supp. 3d at 1239-44.

and producers individually investigated, excluding any zero and de minimis margins, and any margins determined entirely under [19 U.S.C. § 1677e]." 19 U.S.C. § 1673d(c)(5)(A).[22]

Here, because the margins established for all individually-examined respondents in the review were zero, de minimis, or determined entirely under 19 U.S.C. § 1677e (*i.e.*, on the basis of AFA), Commerce calculated the rate for the Separate Rate Companies under the exception to the general rule, which permits the Department to use "any reasonable method." *See id.* § 1673d(c)(5)(B). Commerce therefore took a simple average of Senmao's zero percent rate and Sino-Maple's 96.51 percent rate (the highest transaction-specific margin on the record for Senmao) to arrive at a separate rate of 48.26 percent.

Two companies,[23] Scholar Home and Baishan Huafeng, had filed separate rate applications but were ultimately denied a separate rate. *See* PDM at 12. Commerce found that, because Scholar

---

[22]     Commerce used the method of calculating an "all-others" rate in investigations under 19 U.S.C. § 1673d(c)(5) to calculate the rate for the Separate Rate Companies in this review. Commerce refers to this rate as the "separate rate" in both the Preliminary and Final Results. *See* PDM at 17; *see also* Final IDM at 13, 23-27. While this "separate rate" is not technically an "all-others" rate—an "all-others" rate is limited solely to investigations under the statute—it is often referred to as the "all-others" rate in administrative reviews. *See, e.g.*, *Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357, 1361 (Fed. Cir. 2022) (emphasis added) ("In 2013, Commerce promulgated a new policy for calculating *all-others rates in administrative reviews* for NME entities.") (citing *Antidumping Proceedings: Announcement of Change in Department Practice for Respondent Selection in Antidumping Duty Proceedings and Conditional Review of the Nonmarket Economy Entity in NME Antidumping Duty Proceedings*, 78 Fed. Reg. 65,963-64 (Dep't Commerce Nov. 4, 2013)); *see also, e.g.*, *Changzhou Trina Solar Energy Co. v. United States*, 975 F.3d 1318, 1322 (Fed. Cir. 2020) (alteration in original) (emphasis added) ("In the course of an investigation *or review*, Commerce 'determine[s] the estimated weighted average dumping margin for each exporter and producer individually investigated' *or reviewed* and 'the estimated all-others rate for all exporters and producers not individually investigated' *or reviewed*." (first quoting 19 U.S.C. § 1673d(c)(1)(B)(i); and then citing 19 U.S.C. § 1677f-1(c))).

[23]     Commerce also determined that Jilin Forest Industry Jinqiao Flooring Group Co., Ltd. ("Jilin") was ineligible for a separate rate. *See* Final IDM at 48-52. Though Jilin filed a complaint in *Jilin Forest Industry Jinqiao Flooring Group Co. v. United States*, Court No. 19-00159, ECF No. 10, now part of this consolidated action, and identified a claim in the statement

Home and Baishan Huafeng failed to respond in a timely manner to the Department's supplemental questionnaires regarding separate rate eligibility, it was unable to determine whether these companies were independent from the Chinese government and thus eligible for a separate rate. *See* PDM at 12.

On July 29, 2019, Commerce published its Final Issues and Decision Memorandum, in which it modified certain aspects of the Preliminary Results. *See* Final IDM. As noted above, Commerce preliminarily selected an AFA rate for Sino-Maple of 96.51 percent, which was the highest transaction-specific margin determined for Senmao—the other mandatory respondent in this review. A review of the record, however, demonstrated that this rate resulted from a clerical error. Thus, Commerce amended the AFA rate to reflect the correctly determined highest transaction-specific margin for Senmao, 85.13 percent.[24] *See* Final IDM at 12.

In the Final Results, Commerce assigned the amended AFA rate (85.13 percent) to Sino-Maple and recalculated the rate for the Separate Rate Companies accordingly. Thus, as it had in the Preliminary Results, Commerce took a simple average of the mandatory respondents' rates (*i.e.*, zero percent and 85.13 percent) to arrive at a 42.57 percent rate for the Separate Rate

---

of the issues filed with the court, ECF No. 39, Jilin did not file a motion for judgment on the agency record pursuant to USCIT Rule 56.2(c). Thus, any claim specific to Jilin has been waived. This includes any challenge by Jilin to Commerce's determination that the company is not eligible for a separate rate.

[24]    As shall be seen, a transaction-specific margin cannot withstand judicial review. Later in this opinion the court discusses in more detail that Commerce's use of the highest transaction-specific margin as an AFA rate is not authorized by the statute.

Companies. *See* Final IDM at 23. The rest of Commerce's Final Results remained unchanged from

the Preliminary Results in all relevant respects.[25]

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(c) and will sustain a determination by

Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal*

*Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S.

197, 229 (1938)).

## DISCUSSION

**I.    Commerce's Decision to Use Adverse Facts Available in Determining Sino-Maple's Dumping Margin Is Supported by Substantial Evidence and in Accordance with Law, but Its Method of Selecting the Company's Rate Is Not Authorized by the Statute**

Here, Commerce applied what it calls "total adverse facts available" ("total AFA") to

determine Sino-Maple's dumping margin. While "total AFA" is not defined by statute or agency

regulation, Commerce uses this term to refer to

> a series of steps [it] takes to reach the conclusion that all of a party's reported
> information is unreliable or unusable and that as a result of a party's failure to
> cooperate to the best of its ability, it must use an adverse inference in selecting
> among the facts otherwise available[, even when the missing information may
> relate only to a respondent's U.S. sales, as is the case here].

---

[25]    Commerce made two additional findings in the Final Results that differed from the
Preliminary Results. First, Commerce determined that Guangdong Yihua Timber Industry Co.,
Ltd. was eligible for a separate rate. *See* Final IDM at 5. Second, Commerce determined that
Jiangsu Keri Wood Co., Ltd. and Dalian Guhua Wooden Product Co., Ltd. made no shipments
during the period of review. *See* Final IDM at 5.

*Deacero S.A.P.I. de C.V. v. United States*, 42 CIT __, __, 353 F. Supp. 3d 1303, 1305 n.2 (2018). Thus, Commerce did not calculate an individual rate for Sino-Maple. Rather, it disregarded all of Sino-Maple's reported information and applied an adverse inference in selecting the company's rate. *See* Final IDM at 10-12.

Commerce's disregard of all Sino-Maple's reported information as unusable, and its selection of a rate, resulted from the company's failure to disclose certain "sales made to [Alpha Floors] through a third country," which "left a wide range of its [U.S.] sales information missing and/or unreliable for calculating a preliminary margin" and, "overall, call[ed] into question the reliability of Sino-Maple's reported sales information."[26] Final IDM at 10; *see also* PDM at 15-16.

Commerce then applied an adverse inference in selecting Sino-Maple's rate because the company "failed to cooperate by not acting to the best of its ability to comply with [the Department's] multiple requests for certain sales information[27]," by (1) "repeatedly fail[ing] to disclose its relationship with its [U.S.] affiliate" and (2) failing to timely report certain "sales made to this U.S. affiliate through a third country," despite being "aware of the merchandise sold to its U.S. affiliate well in advance of its initial questionnaire response." *See* PDM at 15; *see also* Final

---

[26]      "If . . . necessary information is not available on the record . . . [Commerce] shall . . . use the facts otherwise available in reaching the applicable determination." 19 U.S.C. § 1677e(a).

[27]      "If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information from [Commerce], the [Department] . . . may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b)(1).

IDM at 10; Sino-Maple Preliminary Adverse Facts Available Mem. (Dec. 17, 2018), PR 409, CR 270 (providing a breakdown of Sino-Maple's "reported" and "unreported" sales).[28]

A.  **Commerce's Facts Available Determination, in Particular, Its Decision to Disregard All of Sino-Maple's Information, Is Supported by Substantial Evidence and in Accordance with Law**

Under the statute, Commerce is permitted to fill gaps in the record with facts available if "necessary information is not available on the record, or . . . an interested party or any other person . . . fails to provide . . . information [that has been requested by Commerce] . . . in the form and manner requested [or] significantly impedes a proceeding." 19 U.S.C. § 1677e(a)(1)-(2).

Sino-Maple[29] argues that Commerce's decision to disregard all of its reported information and select an AFA rate as the company's dumping margin is unsupported by substantial evidence.[30] *See* Sino-Maple's Br. at 19-33. Sino-Maple does not dispute that a significant amount

---

[28]    The breakdown of Sino-Maple's "reported" and "unreported" U.S. sales is as follows:

| Amounts | Reported | Unreported |
|---|---|---|
| Quantity (m2) | 515,766 | 211,757 |
| Value (USD) | $12,437,253 | $5,301,981 |
| Percentage | 71% | 29% |

[29]    Consolidated Plaintiff GreenHome incorporates by reference all factual and legal arguments raised by Sino-Maple in connection with the Department's total AFA determination. *See* GreenHome's Br. at 5.

[30]    The court rejects American Manufacturers' argument that Sino-Maple failed to exhaust its administrative remedies because it failed to raise, at the agency level, its argument that Commerce should have used some of the company's information, rather than total AFA. *See* Def.-Int.'s Resp. Br. at 20. "This court has discretion to determine when it will require the exhaustion of administrative remedies." *Blue Field (Sichuan) Food Indus. Co. v. United States*, 37 CIT 1619, 1627, 949 F. Supp. 2d 1311, 1321 (2013) (citation omitted); *see* 28 U.S.C. § 2637(d) (this Court "shall, where appropriate, require the exhaustion of administrative remedies"). A respondent "cannot circumvent the requirements of the doctrine of exhaustion by merely mentioning a broad issue without raising a particular argument." *Fabrique de Fer de Charleroi S.A. v. United States*, 25 CIT 741, 744, 155 F. Supp. 2d 801, 806 (2001) (citations omitted).

of the company's U.S. sales information was missing from the record. Rather, the company argues that a discrete and identifiable gap in the record existed that could be filled by facts otherwise available. Specifically, Sino-Maple maintains that the total aggregate quantity and value of the missing U.S. sales was on the record, and could have been used to fill the gap left by the unreported U.S. sales. *See* Sino-Maple's Br. at 29-31.

Although Sino-Maple reported the *total aggregate* quantity and value for the missing U.S. sales, that information was of little worth to Commerce's antidumping duty determination because the company failed to report the sales data for each of the individual entries that compose the aggregate. Under the statute, Commerce is required to determine "(i) the normal value and export price (or constructed export price) of each entry of the subject merchandise, and (ii) the dumping margin for each such entry," when calculating an antidumping duty for subject merchandise in administrative reviews. 19 U.S.C. § 1675(a)(2)(A)(i)-(ii). Thus, without transaction-specific sales

---

Nevertheless, a "brief statement of the argument is sufficient [to exhaust administrative remedies] if it alerts [Commerce] to the argument with reasonable clarity and avails the agency with an opportunity to address it." *Id.* (citations omitted).

The court finds that the issues raised in Sino-Maple's case brief were articulated clearly enough to alert Commerce to the company's arguments, and thus satisfy the requirements of the exhaustion doctrine. *See* Sino-Maple's Case Br. at 1-3 (emphasis added) ("The Department's decision to assign Sino-Maple total adverse facts available in the preliminary results was unreasonable and contrary to law," and "[d]espite its attempts to cooperate, Sino-Maple was penalized to the *fullest extent* of the law even though the Department had sufficient time to accept and consider the additional information that Sino-Maple attempted to submit for the record."). Indeed, Commerce addressed each of Sino-Maple's arguments in its decisional memoranda for the Preliminary and Final Results. Moreover, American Manufacturers' claim that there is a difference under the law as to when some information is either missing from the record or should be disregarded, and when Commerce should disregard all of the information, assumes a distinction not found in the statute. *See* 19 U.S.C. § 1677e(a)-(b) ("If . . . necessary information is not available on the record [Commerce] shall . . . use the facts otherwise available in reaching the applicable determination . . . . If [Commerce] finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information [it] may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available."). Thus, the court will consider the merits of Sino-Maple's arguments.

data, Commerce could not calculate dumping margins for the individual entries that made up Sino-Maple's missing U.S. sales—which accounted for nearly one-third of the company's total U.S. sales during the period of review. *See* 19 U.S.C. § 1677(35)(A) ("The term 'dumping margin' means the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise.").

Because Commerce could not calculate the transaction-specific dumping margins for Sino-Maple's missing U.S. sales, it was unable to calculate an accurate weighted-average dumping margin for Sino-Maple. *See Grobest & I-Mei Indus. (Vietnam) Co. v. United States*, 36 CIT 1092, 1098, 853 F. Supp. 2d 1352, 1359 (2012) ("[T]he § 1677(35)(A) dumping margin serves as the basis for a § 1677(35)(B) weighted average margin, and the weighted average dumping margin serves as the basis for the antidumping duty or estimated antidumping duty.").[31] Hence, Sino-Maple's failure to provide constructed export price information on a per transaction basis for the U.S. sales made to Alpha Floors by the third-country manufacturer prevented Commerce from performing a necessary step in its overall dumping analysis.

Sino-Maple also failed to point to any record information that Commerce could use as facts otherwise available to fill the gap created by the missing U.S. sales to Alpha Floors from the third-country manufacturer. Because Sino-Maple failed to report transaction-specific sales

---

[31]     Commerce's default method for comparing home market and export prices in administrative reviews is the "average-to-average" method. *See* 19 C.F.R. § 351.414(c)(1) (2017). On occasion, Commerce will use the "average-to-transaction" method as an alternative method for comparing home market and export prices in reviews. *See id.* § 351.414(b)(3), (e). In unusual circumstances, "such as when there are very few sales of subject merchandise and the merchandise sold in each market is identical or very similar or is custom-made," Commerce will use the "transaction-to-transaction" method. *See id.* § 351.414(c)(2). All of these methods, however, require knowing the transaction-specific data for each U.S. sale made during the relevant period of review. Therefore, Sino-Maple's failure to provide the constructed export price data for each individual entry is not specific to any particular calculation method.

information for the missing U.S. sales, and nothing on the record could be used to fill the gap with facts otherwise available, Commerce lacked the necessary information to determine the constructed export price of Sino-Maple's U.S. sales during the period of review.

In situations, such as this, where there is missing information that cannot be supplied by facts otherwise available, and as a result either normal value (the home market sales price) or export or constructed export price (the U.S. sales price), or both, cannot be determined, Commerce cannot perform a dumping analysis, *i.e.*, a comparison of normal value and export or constructed price.

Where there are no other facts on the record that can be substituted for the missing information, Commerce has been permitted to find that it cannot calculate a rate and substitute a rate for what would otherwise be a calculation. *See Hyundai Elec. & Energy Sys. Co. v. United States*, 44 CIT __, __, 466 F. Supp. 3d 1303, 1309, 1317-18 (2020) (upholding Commerce's substitution of a previously calculated rate where "one of the major categories of information necessary to perform a dumping calculation (U.S. sales, home market sales, cost of production, or constructed value) has not been provided" (citing *Steel Auth. of India, Ltd. v. United States*, 25 CIT 482, 486, 149 F. Supp. 2d 921, 927-28 (2001))).

Commerce might say—as it has here—that, in these situations, it is entitled to apply what it calls "total" facts available and assign a rate, even an adverse rate. Here, Commerce, using "total" AFA, substituted a rate for what would otherwise be a calculation. Commerce did so because it determined that all of Sino-Maple's reported information was unusable, not because it was missing certain information necessary to perform a dumping analysis. *See* Def.'s Resp. Br. at 27.

While the result may be the same (*i.e.*, disregarding all of Sino-Maple's information and selecting a rate), the court believes Commerce's analysis to be improper. This is because it is not

the case that all of Sino-Maple's information is unusable. Although Commerce cannot calculate constructed export price without knowing the transaction-specific information for approximately one-third of Sino-Maple's U.S. sales, it appears that the Department would still be able to calculate normal value using information provided by the company. Therefore, using a legal fiction to find that all of Sino-Maple's information is unusable is not quite right.

Rather, what results from these circumstances is more akin to an impossibility. Thus, the proper analysis might be found in those cases holding that, given the lack of facts on the record, Commerce simply cannot perform its statutory task. *See, e.g.*, *Steel Auth. of India*, 25 CIT at 486, 149 F. Supp. 2d at 927-28 (upholding Commerce's decision to disregard all of a respondent's reported information and substitute a rate for what would otherwise be a calculation where "the absence of either cost of production, home market sales, or U.S. sales data makes it impossible for the Department to make price-to-price comparisons" necessary to determine an accurate dumping margin). In other words, where either normal value or export or constructed export price cannot be ascertained, it is simply not possible to determine a weighted-average dumping margin and hence an antidumping duty rate. *See id.*, 25 CIT at 486, 149 F. Supp. 2d at 927 ("[I]n order to make a reliable antidumping determination, the Department needs the respondent's data on U.S. sales, home market sales, cost of production, and constructed value.").

Thus, in this case, it might be better said that Commerce may disregard all of Sino-Maple's information and assign a rate, not because all of the company's information was "unusable," as the Department claims, but because the missing information is necessary to the calculation of a dumping margin. Sino-Maple's U.S. sales information is needed for Commerce's dumping analysis because without it there is nothing to compare to normal value, and therefore it is impossible to determine a dumping margin for Sino-Maple.

Because the information needed to determine Sino-Maple's U.S. sales price is missing from the record, it is impossible for the Department to accurately calculate a dumping margin for Sino-Maple and the court thus concludes that Commerce lawfully disregarded all of Sino-Maple's information. As a result, Commerce's facts available determination is sustained.

### B.      Commerce's Adverse Inference Determination Is Supported by Substantial Evidence and in Accordance with Law

Here, Commerce found the use of adverse inferences was warranted because Sino-Maple failed to put forth its maximum effort, when responding to the Department's questionnaires, because it withheld information regarding certain sales made to Alpha Floors through a third country. The Department claims that Sino-Maple did not produce this information despite having repeated opportunities to do so, and despite being aware that these sales would be relevant to its reporting in this review. *See* Final IDM at 11-12.

When Commerce determines that the use of facts available is warranted under 19 U.S.C. § 1677e(a), it may use an adverse inference in selecting from among those facts available only if it makes the requisite additional finding under 19 U.S.C. § 1677e(b), that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information from the [Department]." *See* 19 U.S.C. § 1677e(a)-(b); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003) (citation omitted) (cleaned up) ("[S]ubsection (b) permits Commerce to use an inference that is adverse to the interests of a respondent in selecting from among the facts otherwise available, only if Commerce makes the separate determination that the respondent has failed to cooperate by not acting to the best of its ability to comply.").

To find that a respondent has failed to cooperate to the best of its ability, the Department must make two showings:

> First, it must make an *objective* showing that a reasonable and responsible [respondent] would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations. Second, Commerce must then make a *subjective* showing that the respondent under investigation not only has failed to promptly produce the requested information, but further that the failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to *investigate and obtain* the requested information from its records.

*Nippon Steel*, 337 F.3d at 1382-83 (emphasis added) (citing *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1336 (Fed. Cir. 2002)).

There is little doubt that Sino-Maple failed objectively to produce the information Commerce requested. First, it has participated in prior reviews. *Cf.* Sino-Maple's Br. at 3. Second, Commerce sent multiple questionnaires to Sino-Maple instructing the company to report all of its U.S. sales of subject merchandise during the period of review—including merchandise shipped through third countries—and to accurately explain its relationship with Alpha Floors. *See, e.g.*, Sino-Maple Quantity & Value Quest. (May 18, 2018) at attach. 1, PR 206 ("Please include . . . sales to third-countries for which you have knowledge that the merchandise was ultimately destined for the United States . . . ."); Sino-Maple Antidumping Quest. at A-5 ("[F]or all affiliated producers of the merchandise under consideration, please provide [a d]escription of the [a]ffiliated [p]roducer's [r]elationship to the [r]espondent."); Sino-Maple's Resp. Secs. C & D Quest. at 1 ("Report each U.S. sale of merchandise entered for consumption during the [period of review].");
First Suppl. Quest. at 4 ("Explain Sino-Maple's relationship with Alpha Floors, including whether Alpha Floors assists Sino-Maple with finding U.S. customers and/or facilitating the sale of subject merchandise in the United States.").

The U.S. sales made to Alpha Floors by the third-country manufacturer that Sino-Maple failed to report were directly related to and requested by Commerce in the multiple questionnaires

that were issued to Sino-Maple; and Sino-Maple makes no claim that the information does not exist. Although this review was the first time that it was selected as a mandatory respondent, a reasonable and responsible respondent in Sino-Maple's position would have known to report its sales relationship with Alpha Floors and the third-country information because (1) it had participated in prior reviews and (2) Commerce made clear requests for the information and provided clarifying questions in the supplemental questionnaires.

Thus, Commerce satisfied the objective requirement under *Nippon Steel* because Sino-Maple failed to report the U.S. sales information requested by the Department, even though the information was being kept, and a reasonable and responsible respondent in Sino-Maple's position would have known such information was required under the applicable statutes, rules, and regulations.

Also, Sino-Maple failed subjectively to put forth its maximum effort to investigate and obtain the requested information. In the Final Results, the Department found that Sino-Maple was "well-aware prior to its initial questionnaire response that certain third country sales would be directly relevant to its reporting in this review, and yet, Sino-Maple withheld all of this information." Final IDM at 11. Sino-Maple did not notify the Department of the existence of these sales until November 14, 2018, despite having the opportunity to report it in the company's September 13, 2018, questionnaire response, and its November 5, 2018, supplemental questionnaire response. *See* Ext. Req.; *see also* Sino-Maple's Resp. Secs. C & D Quest.; Sino-Maple's Resp. First Suppl. Quest. Both questionnaire responses were made after Customs notified Sino-Maple's affiliate, Alpha Floors, on September 5, 2018, that it intended to treat certain of its imports as wood flooring from China subject to antidumping duties in this review. *See* Ext. Req., Ex. 1. Thus, for Commerce, Sino-Maple failed to act to the best of its ability in responding

to the Department's requests for information because the company "failed to report the sales of subject merchandise by its affiliate during the [period of review], despite repeated opportunities to do so." Final IDM at 12.

Sino-Maple argues that Commerce's finding is unsupported by substantial evidence because it believed, in good faith, until after November 7, 2018,[32] that the U.S. sales made to Alpha Floors by the third-country manufacturer were not relevant to its reporting requirements in this review. Thus, Sino-Maple contends that it promptly disclosed the U.S. sales made to Alpha Floors by the third-country manufacturer on November 14, 2018, as soon as it understood the relevance of these sales to its reporting requirements. *See* Sino-Maple's Br. at 22-24; *see also* Ext. Req. at 1.

This argument is hard to credit. The record shows that Sino-Maple's U.S affiliate, Alpha Floors, submitted information in response to Customs' inquiries in the separate proceeding, relating to the entry of flooring manufactured in a third country, as early as six months before Sino-Maple filed its Section A Questionnaire Response on September 4, 2018.[33] *See* Ext. Req.

---

[32]    On November 7, 2018, Customs, in the separate proceeding involving Alpha Floors' imports of subject wood flooring from Cambodia, reaffirmed its September 5, 2018, determination that such entries would be treated as wood flooring from China and therefore subject to antidumping duties in Sino-Maple's review. *See* Ext. Req., Ex. 3.

[33]    In February and March of 2018, Alpha Floors provided information to Customs regarding the appropriate Generalized System of Preferences status of a single entry of multilayered wood flooring that Alpha Floors had purchased from the unaffiliated Cambodian manufacturer. *See* Ext. Req. at 2-3. On June 7, 2018, Customs conducted a site visit at the Cambodian manufacturer's factory. On July 31, 2018, Commerce issued an initial antidumping questionnaire to Sino-Maple. *See* Sino-Maple Antidumping Quest. Sino-Maple submitted its Section A Questionnaire Response on September 4, 2018. *See* Sino-Maple's Resp. Sec. A Quest. On September 5, 2018, Alpha Floors received a notice of proposed action from Customs stating that it had conducted a Generalized System of Preferences verification of the Cambodian factory and determined that the processing of the plywood cores from China that occurred in Cambodia was minimal and did not qualify for a tariff shift. *See* Ext. Req., Ex. 1. Thus, Customs proposed to treat Alpha Floors' imports of multilayered wood flooring from Cambodia as merchandise of Chinese origin subject to applicable antidumping and countervailing

at 3. The record further shows that Commerce requested information pertaining to all of Sino-Maple's U.S. sales of subject wood flooring—particularly as they related to the company's relationship with any U.S. affiliates (*i.e.*, Alpha Floors)—as early as July 31, 2018. *See* Sino-Maple Antidumping Quest.

In its July 31, 2018, antidumping questionnaire, Commerce asked Sino-Maple to report its relationship with any U.S. affiliates (*i.e.*, Alpha Floors) and the role they had, if any, in the company's U.S. sales process of the subject wood flooring. *See* Sino-Maple Antidumping Quest.

---

duties. *See* Ext. Req., Ex. 1. On September 13, 2018, Sino-Maple submitted its Sections C & D Questionnaire Response. *See* Sino-Maple's Resp. Secs. C & D Quest. On October 17, 2018, Commerce issued a supplemental questionnaire asking Sino-Maple to clarify inconsistencies in the company's reporting regarding certain U.S. sales involving Alpha Floors. *See* First Suppl. Quest. On October 20, 2018, Customs notified Alpha Floors that it had three days to deposit antidumping and countervailing duties in connection with its entries of multilayered wood flooring from Cambodia. *See* Ext. Req., Ex. 3. Customs, however, granted Alpha Floors' request for additional time, until November 6, 2018, to provide further explanation of the processing of Chinese-origin plywood core into multilayered wood flooring in Cambodia. *See* Ext. Req., Ex. 3. On November 5, 2018, Sino-Maple submitted its first supplemental questionnaire response. *See* Sino-Maple's Resp. First Suppl. Quest. On November 6, 2018, Alpha Floors timely submitted its response asking Customs to treat the relevant entries as wood flooring from Cambodia because the majority, and most important stages of the manufacturing process took place in Cambodia. On November 7, 2018, Customs responded to Alpha Floors, stating that it had reviewed the company's additional information, but remained of the opinion that the entries should be treated as multilayered wood flooring from China and therefore subject to applicable antidumping and countervailing duties. *See* Ext. Req., Ex. 3. On November 9, 2018, Commerce issued a second supplemental questionnaire to Sino-Maple asking the company again to clarify certain inconsistencies in its reporting regarding its relationship with Alpha Floors. *See* Second Suppl. Quest. On November 14, 2018, in response to the Department's second supplemental questionnaire, Sino-Maple filed a request for an extension of time to provide additional U.S. sales information involving Alpha Floors' imports of subject wood flooring from Cambodia. *See* Ext. Req. On November 16, 2018, Commerce denied Sino-Maple's extension request. *See* Ext. Req. Denial. Sino-Maple submitted its second supplemental questionnaire response that same day. The company described Alpha Floors' role in facilitating sales of subject wood flooring in the United States. It also reported the aggregate quantity (2,279,331 square feet) and value ($5,301,981) of Alpha Floors' imports of subject wood flooring from Cambodia as constructed export price sales. *See* Sino-Maple's Resp. Second Suppl. Quest.

In its September 4, 2018, questionnaire response, Sino-Maple stated that it (1) "didn't sell the subject merchandise to affiliated resellers during the [period of review];" (2) "[was] not aware that any of the merchandise sold to third countries that was ultimately shipped to the United States;" (3) "produce[d] all the subject merchandise by itself without any intermediate party involved in the production;" and (4) "produced and sold the merchandise under consideration to the United States by itself." *See* Sino-Maple's Resp. Sec. A Quest.

The problem here is that, on September 5, 2018, Customs issued a proposed notice of action to Alpha Floors which explicitly stated that Alpha Floors' imports of multilayered wood flooring from the third country would be considered multilayered wood flooring from China, and subject to antidumping duties in the review of Sino-Maple. *See* Ext. Req., Ex. 1.[34] Even in the face of this notice, however, Sino-Maple made no effort to supplement its questionnaire responses made the preceding day.

It is worth keeping in mind that Sino-Maple and Alpha Floors are hardly strangers—they are sister companies. In its questionnaire responses, Sino-Maple states that Alpha Floors is "affiliated with Sino-Maple under the law" and lists Alpha Floors as "[u]nder the control of the same controller." Sino-Maple's Resp. First Supp. Quest. at 5; *see also* Sino-Maple's Resp. Sec. A Quest., Ex. A-11. The statute defines "affiliated persons," in relevant part, as "[t]wo or more persons directly or indirectly controlling, controlled by, or under common control with, any

---

[34]     "The [third-country] manufacturer uses plywood cores from China to manufacture the final product; The processing that occurs within Cambodia is minimal and does not qualify for a tariff shift . . . ; The country of origin for the merchandise will be considered China; . . . The merchandise is subject to anti-dumping . . . duties under case number[] A-570-970 [(*i.e.*, the anti-dumping review of Sino-Maple)]." Ext. Req., Ex. 1.

person." 19 U.S.C. § 1677(33). Thus, because Alpha Floors is "[u]nder the control of the same controller" as Sino-Maple, the companies are "affiliated persons" by law.[35]

Remarkably, despite Customs' clear statement on September 5, 2018, and Sino-Maple's close relationship with Alpha Floors, Sino-Maple failed to provide any information, or even notify Commerce of the existence of these U.S. sales, in its September 13, 2018, questionnaire responses, or, even more remarkably, its November 5, 2018, supplemental questionnaire response.[36] Instead, Sino-Maple waited until November 14, 2018, to bring these sales to Commerce's attention in a request for an extension of time—which Commerce denied.[37]

As the party in possession of the necessary information, Sino-Maple bore the burden of creating an accurate record by putting forth its maximum effort to investigate and obtain the

---

[35]     Indeed, Alpha Floors and Sino-Maple are sister companies operating under control of the same parent company. *See* Sino-Maple's Resp. Sec. A Quest., Ex. A-9. Alpha Floors was the only U.S. affiliate of Sino-Maple that purchased subject wood flooring from Sino-Maple during the period of review. *See* Sino-Maple's Resp. Sec. A Quest., Ex. A-9. Alpha Floors also facilitated Sino-Maple's sales of subject wood flooring in the United States by assisting Sino-Maple in finding unaffiliated U.S. customers. *See* Sino-Maple's Resp. First Supp. Quest. at 5.

[36]     On November 16, 2018, Sino-Maple submitted its second supplemental questionnaire response which also failed to provide the necessary information for Commerce to include these sales in its antidumping calculations. *See* Sino-Maple's Resp. Second Suppl. Quest. The Preliminary Decision Memorandum was issued on December 17, 2018, and the Final Issues and Decision Memorandum on July 29, 2019. *See* PDM; *see also* Final IDM.

[37]     As noted above, whether Commerce abused its discretion when it denied Sino-Maple's request for an extension of time is not at issue in this case because Sino-Maple did not raise it before the court, and GreenHome failed to develop this argument in its brief. Moreover, unlike in *Hitachi Energy USA Inc. v. United States*, here, Commerce complied with its statutory mandate under 19 U.S.C. § 1677m(d) by providing Sino-Maple notice of its reporting deficiencies in the form of multiple supplemental questionnaires, and by providing the company with an opportunity to remedy or explain the deficiency in a timely manner. *Cf.* 34 F.4th 1375 (Fed. Cir. 2022), *modified on denial of rehearing*, No. 20-2114, 2022 WL 17175134 (Fed. Cir. Nov. 23, 2022) ("[T]he previous precedential opinion issued May 24, 2022, is modified as follows: On page 16, line 12, after 'unqualified' insert 'in the circumstances of this case.'"). Thus, the circumstances presented in *Hitachi* that led the Federal Circuit to find that the respondent had an "unqualified" right to a second bite at the apple under 19 U.S.C § 1677m(d) are not present in this case.

information requested by Commerce. *See Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) (citation omitted) ("The burden of production [belongs] to the party in possession of the necessary information."). Sino-Maple, through its U.S. affiliate, was on notice as early as September 5, 2018, that certain third-country sales made to its U.S. affiliate, Alpha Floors, were relevant to its reporting in this review because of the separate Customs proceeding. Although Commerce did not ask Sino-Maple about these exact sales in particular, the Department did request that Sino-Maple identify all U.S. affiliates and report all U.S. sales of subject wood flooring during the period of review.

Based on this close relationship, it is reasonable, in this case, for Commerce to expect Sino-Maple to communicate with its U.S. affiliate and promptly notify Commerce of a significant number of constructed export price sales that were not initially reported. *See* 19 U.S.C. § 1677e(b). In other words, because Commerce asked Sino-Maple to explain its relationship with Alpha Floors on multiple occasions, and to report all U.S. sales of subject wood flooring during the period of review, it was not unreasonable to expect Sino-Maple to make the necessary inquiries to accurately answer Commerce's questions about these sales. *See, e.g.*, *N.M. Garlic Growers Coal. v. United States*, 42 CIT __, __, 352 F. Supp. 3d 1281, 1293-94 (2018) (holding that substantial evidence supported Commerce's determination that a producer failed to act to the best of its ability, as a sophisticated company, to provide affiliate information as a result of the producer's inadequate inquiry into the scope of Commerce's requests for information and the fact that the producer failed to remedy the deficiencies in its responses despite opportunities to do so).

The complete universe of U.S. sales is one of the most important pieces of information in an antidumping proceeding, and any reasonable respondent should know that this information is necessary. *See Hyundai Heavy Indus., Co. v. United States*, 43 CIT __, __, 399 F. Supp. 3d 1305,

1313 (2019) ("The U.S. and home market prices are central to the dumping calculation."). More, a respondent can be charged with the duty of knowing its own business.

Thus, Sino-Maple, in fulfilling its duty to investigate and obtain the information requested by Commerce, had reason to further consult Alpha Floors about its purchases. Had Sino-Maple made this inquiry, it would have learned of the separate Customs proceeding investigating its U.S. affiliate's imports of flooring from the third-country manufacturer.

Therefore, Sino-Maple did not "put forth its maximum effort," as it was able, but failed to fully investigate and obtain the requested U.S. sales information necessary to Commerce's antidumping calculations. Although for many years the statute simply provided that the Department might apply an adverse inference "in selecting from among the facts otherwise available," 19 U.S.C. § 1677e(b)(1)(A), and although a rate is certainly not a fact, s*ee Gerber Food (Yunnan) Co. v. United States*, 31 CIT 921, 944, 491 F. Supp. 2d 1326 (2007), *superseded by statute as discussed in Deosen Biochemical Ltd. v. United States*, 42 CIT __, __, 307 F. Supp. 3d 1364, 1372 (2018), *aff'd,* 767 F. App'x 1008 (Fed. Cir. 2019), the statute now confirms the Department's use of rates as facts. *See* 19 U.S.C. § 1677e(d)(1) ("If [Commerce] uses an inference that is adverse to the interests of a party . . . in selecting among the facts otherwise available, [it] may . . . in the case of an antidumping duty proceeding, use any dumping margin from any segment of the proceeding under the applicable antidumping order."). Thus, Commerce may lawfully apply an adverse inference when determining Sino-Maple's rate.

Because (1) Sino-Maple was put on notice that information related to Alpha Floors' third-country imports of subject wood flooring was needed to fully answer Commerce's questionnaires and (2) it failed to adequately investigate and obtain the information in a timely fashion, the court concludes that Commerce's finding that Sino-Maple failed to cooperate to the

best of its ability is supported by substantial evidence and in accordance with law. Therefore, the

Department's use of adverse inferences to determine the company's dumping margin is sustained.

### C.   Commerce's Method of Determining Sino-Maple's Adverse Facts Available Rate Is Not Authorized by the Statute

Here, Commerce used what it called Senmao's highest "transaction-specific"[38] dumping

margin from this review as Sino-Maple's AFA rate. *See* Final IDM at 12 ("For these final results,

we have amended the AFA rate to reflect the actual highest transaction-specific dumping margin

for Senmao, or 85.13 percent."). The Department stated, in the Preliminary Decision

Memorandum, that it used this rate "[t]o ensure that [Sino-Maple] does not benefit from its lack

of cooperation, and to select a rate that is sufficiently adverse to induce cooperation in the future .

---

[38]       Commerce's use of the term "transaction-specific" might be a little misleading. Normally, a transaction-specific margin would be thought of as the comparison of a single U.S. sale to a single home-market sale (*i.e.*, a transaction-to-transaction comparison). *See PAM, S.p.A. v. United States*, 32 CIT 779, 780 n.2 (2008) (emphasis added) (not reported in the Federal Supplement) ("A transaction-specific dumping margin compares a single U.S. sale to a single home-market sale."); *see also* 19 C.F.R. § 351.414(b)(2) ("The 'transaction-to-transaction' method involves a comparison of the normal values of individual transactions with the export prices (or constructed export prices) of individual transactions for comparable merchandise."). Here, the 85.13 percent margin Commerce selected as Sino-Maple's AFA rate was apparently the highest margin calculated on the record for Senmao using the average-to-transaction method as part of the Department's differential pricing analysis. *See* Nonmarket Economy Margin Calculation Program (Dec. 17, 2018), CR 269. That is, to arrive at this margin, Commerce probably compared a single Senmao U.S. sale to the weighted-average normal value for the contemporaneous month. *See* 19 C.F.R. § 351.414(b)(3), (e) ("The 'average-to-transaction' method involves a comparison of the weighted average of the normal values to the export prices (or constructed export prices) of individual transactions for comparable merchandise."). Whichever method Commerce used does not affect the court's analysis.

As to Senmao's overall dumping margin, Commerce used the average-to-average method. *See* PDM at 23; *see also* 19 C.F.R. § 351.414(b)(1), (d)(3) ("The 'average-to-average' method involves a comparison of the weighted average of the normal values with the weighted average of the export prices (and constructed export prices) for comparable merchandise. . . . When applying the average-to-average method in a review, [Commerce] normally will calculate weighted averages on a monthly basis and compare the weighted-average monthly export price or constructed export price to the weighted-average normal value for the contemporaneous month.").

. . ." PDM at 16. In the Final Issues and Decision Memorandum, the Department neither stated the

source of its legal authority to use Senmao's highest transaction-specific margin as the AFA rate

assigned to Sino-Maple,[39] nor did Commerce address the argument, raised by Scholar Home in its

case brief, that the selection of this rate was unreasonable, punitive, and not in accordance with

law. *See* Scholar Home's Case Br. (June 27, 2019) at 22-27, PR 482, CR 290. Rather, Commerce

merely amended Sino-Maple's AFA rate—correcting a clerical error made in the Preliminary

Results—to reflect the actual highest transaction-specific margin for Senmao (*i.e.*, 85.13 percent).

*See* Final IDM at 12.

As noted, Commerce's selection of a dumping margin using an adverse inference is

governed, in part, by 19 U.S.C. § 1677e(d). Paragraph (1) of § 1677e(d) states that, "[i]f

[Commerce] uses an inference that is adverse to the interests of a party . . . in selecting among the

facts otherwise available, [it] may . . . in the case of an antidumping duty proceeding, use any

dumping margin from any *segment* of the proceeding under the applicable antidumping order." 19

U.S.C. § 1677e(d)(1) (emphasis added).

The statute defines a "dumping margin" as "the amount by which the normal value exceeds

the export price or constructed export price of the subject merchandise." *Id.* § 1677(35)(A). The

term "segment" is not defined by the statute. The Department's regulations, however, define a

"segment" of a proceeding as "a portion of the proceeding that is reviewable under [19 U.S.C.

§ 1516a]." 19 C.F.R. § 351.102(b)(47)(i). Examples of a "segment" of a proceeding, as provided

---

[39]     While Commerce did not specifically provide legal authority for using the highest
transaction-specific margin in the Final Results, it did state the following in the Preliminary
Results: "Under [19 U.S.C. § 1677e(d),] Commerce may use any *dumping margin* from any
segment of a proceeding under an [antidumping duty] order when applying an adverse inference,
including the highest of such margins." PDM at 14 (emphasis added).

in Commerce's regulations, are "[a]n antidumping or countervailing duty *investigation* or a *review*

of an [antidumping or countervailing duty] order . . . ." *Id.* § 351.102(b)(47)(ii) (emphasis added).

Paragraph (2) under § 1677e(d) further authorizes Commerce, in its discretion, to use the

highest *dumping margin from any segment* when applying an adverse inference in selecting from

among facts available. *See* 19 U.S.C. § 1677e(d)(2) (emphasis added). Paragraph (2) reads:

> In carrying out paragraph (1), [*i.e.*, the application of adverse inferences,
> Commerce] may apply any of the . . . dumping margins specified under that
> paragraph [*i.e.*, any segment of the proceeding], including the highest such . . .
> margin, based on the evaluation by [Commerce] of the situation that resulted in
> [Commerce] using an adverse inference in selecting among the facts otherwise
> available.

*Id.* § 1677e(d)(2).

Thus, the statute permits Commerce to use the highest "dumping margin" from any

"segment" of the proceeding as the AFA rate. The statute does not mention a "transaction-specific"

dumping margin.

Here, Commerce apparently construes the statutory language that permits it to use its

discretion to apply the highest dumping margin from any segment to mean that it may apply the

highest transaction-specific dumping margin calculated for the other mandatory respondent in this

review.[40] This is not a lawful interpretation of the statute.

The Trade Preferences Extension Act of 2015 amended the statute to permit Commerce to

use the highest margin from any *segment*. *See* Trade Preferences Extension Act of 2015 § 502,

Pub. L. No. 114-27, 129 Stat. 362 (2015) (codified in 19 U.S.C. § 1677e(d)) (emphasis added).

---

[40]     Defendant, in its brief, primarily relies on *Nan Ya Plastics Corp. v. United States*
to support Commerce's use of the highest transaction-specific rate for Senmao as Sino-Maple's
AFA rate. *See* Def.'s Resp. Br. at 32; *see also Nan Ya Plastics Corp. v. United States*, 810 F.3d
1333 (Fed. Cir. 2016). *Nan Ya Plastics*, however, dealt with a version of the statute that pre-dates
the enactment of the Trade Preferences Extension Act of 2015, which amended 19 U.S.C. § 1677e
to add section (d).

The amendment's inclusion of the term segment, defined by Commerce as a reviewable portion of a proceeding, indicates that the margin selected by Commerce should be one that can be reviewed. *See* 19 C.F.R. § 351.102(b)(47). A transaction-specific dumping margin is not reviewable. *See, e.g.*, 19 U.S.C. § 1516a(2)(B) (defining reviewable determination as any "[f]inal affirmative determinations by [Commerce] under section . . . 1673d of this title, including any negative part of such a determination" as well as "[a] final determination . . . by [Commerce] under section 1675 of this title").[41]

Moreover, when presented with the opportunity to include transaction-specific margins as one of the kinds of margins available for Commerce to use as the basis for selecting an AFA rate, Congress rejected it. The legislative history makes this clear. The legislative history for 19 U.S.C. § 1677e—specifically, subsections (d)(1)(B) and (d)(2)—illustrates the manner in which Congress considered how an AFA dumping margin should be determined.

The relevant language was considered by Congress for the first time in the Leveling the Playing Field Act, which was introduced in the Senate by Senator Sherrod Brown on December 10, 2014. *See* Leveling the Playing Field Act, S. 2994, 113th Cong. (2013-2014). Senator Brown's bill proposed that 19 U.S.C. § 1677e(d)(1)(B) read:

(B) in the case of an antidumping duty proceeding, [Commerce may] use—

---

[41]    It follows that the "reviewable" determinations provided under 19 U.S.C. § 1516a(2)(B), in the case of an antidumping duty proceeding, refers to the overall dumping margin percentages assigned to specific companies that serve as the basis for determining an antidumping duty rate or inform Commerce's decision to initiate an investigation or review. Some examples include (1) the weighted-average dumping margin calculated for an individually investigated respondent; (2) the separate rate calculated for companies that were not individually investigated but were able to rebut Commerce's presumption of state control; (3) the rate assigned to the "China-wide" entity; and (4) a rate derived from the petition that gave rise to an investigation or review.

(i) a dumping margin based on any *individual sale* of the subject merchandise calculated with respect to any exporter or producer involved in the proceeding during the investigation or review,

(ii) an individual weighted average dumping margin calculated with respect to any exporter or producer involved in the proceeding during the investigation or a review,

(iii) any dumping margin alleged in a petition filed under section 732(b) that was relied on by the administering authority to initiate the antidumping duty investigation, or

(iv) any dumping margin found in another antidumping duty proceeding with respect to a class or kind of merchandise that is the same or similar to and from the same country as subject merchandise involved in the proceeding.

Leveling the Playing Field Act, S. 2994, 113th Cong. (2013-2014) (emphasis added).

Thus, Senator Brown's bill proposed that Commerce be permitted to use "a dumping margin based on any *individual sale* of the subject merchandise calculated with respect to any exporter or producer involved in the proceeding during the investigation or review," *i.e.*, a transaction-specific margin. *See* Leveling the Playing Field Act, S. 2994, 113th Cong. (2013-2014). But this language did not appear in the statute as enacted. In other words, Senator Brown's initial bill would have permitted the use of a transaction-specific margin, but the final wording of the statute did not. *See id.* The "individual sale" language was removed before the final version of the bill was passed by the Senate and the segment language was substituted. Thus, the subsection, as enacted, reads: "in the case of an antidumping duty proceeding, [Commerce may] use any dumping margin from any *segment* of the proceeding under the applicable antidumping order." 19 U.S.C. § 1677e(d)(1)(B) (emphasis added); *see also* Trade Preferences Extension Act of 2015 § 502, 129 Stat. at 384.

The legislative history confirms that Congress modeled the Trade Preferences Act's amendments to 19 U.S.C. § 1677e after Senator Brown's bill and that any differences between the

bill and the finally enacted statute are a result of Congress acting intentionally and purposefully. That is, Congress had the opportunity to include the "individual sale" language but chose not to. Thus, the purposeful elimination of any reference to an "individual" sale or margin (*i.e.*, a "transaction-specific" margin) in the relevant statutory provision, as enacted, can be presumed to be intentional. *See, e.g.*, *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (citations omitted) ("Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."); *see also e.g.*, *Russello v. United States*, 464 U.S. 16, 23-24 (1983) (citations omitted) ("Where Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended."). As such, it appears that the term highest "dumping margin" from any segment, in the case of an antidumping duty proceeding, should be interpreted to exclude any "transaction-specific" dumping margin.

Accordingly, while 19 U.S.C. § 1677e(d)(2) permits Commerce to select the highest dumping margin from any segment of the proceeding and apply it as the AFA rate, pursuant to the statute Commerce may not choose a transaction-specific margin as the AFA rate. Thus, Commerce acted contrary to the statute when it used Senmao's highest transaction-specific margin as the AFA rate for Sino-Maple.

On remand, Commerce must reconsider the method used to select Sino-Maple's AFA rate in a manner consistent with this Opinion and Order, and the statute.

## II.   Commerce's Determination That Neither Scholar Home Nor Baishan Huafeng Was Eligible for a Separate Rate Is Supported by Substantial Evidence and in Accordance with Law

Scholar Home and Baishan Huafeng each separately challenge Commerce's determination that neither company was eligible for a separate rate.

While not without controversy,[42] in proceedings involving nonmarket economy countries,[43] such as this one, Commerce applies a rebuttable presumption that all respondents are subject to state control and should be assessed a single country-wide antidumping duty rate. *See Sigma Corp. v. United States*, 117 F.3d 1401, 1405-07 (Fed. Cir. 1997). Respondents that can rebut this presumption—by demonstrating an absence of both *de jure* and *de facto* control by the state— are eligible for "a rate that is separate from the country-wide rate assigned to all companies or entities that are presumptively considered state-controlled as part of an amalgamated '[nonmarket economy] entity.'" *See Jilin*, 45 CIT at __, 519 F. Supp. 3d at 1229; *see also Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 38 CIT __, __, 28 F. Supp. 3d 1317, 1338-39 (2014).

Commerce's evaluation as to whether a particular respondent is eligible for a separate rate requires the nonmarket economy respondent to submit a separate rate application reporting

---

[42]        *See Jilin*, 45 CIT at __, 519 F. Supp. 3d at 1239-44 (discussing Commerce's use of its nonmarket economy policy).

[43]        A "nonmarket economy country" is defined as

"any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." The implication for entities operating subject to a nonmarket economy structure is that their financial and sales information is unreliable for the purpose of determining the "normal value" of subject merchandise.

*Jilin*, 45 CIT at __, 519 F. Supp. 3d at 1228 n.1 (alteration in original) (first quoting 19 U.S.C. § 1677(18)(A); then citing 19 U.S.C. § 1677b(a); and then citing *Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004)).

information demonstrating an absence of state control over its export functions. *See Sao Ta Foods Joint Stock Co. v. United States*, 44 CIT __, __, 475 F. Supp. 3d 1283, 1288 (2020) ("To establish independence from governmental control, a company submits a separate rate application."); *see also* Import Admin., U.S. Dep't Commerce, *Separate-Rates Practice & Application of Combination Rates in Antidumping Investigation Involving Non-Market Economy Countries*, Policy Bulletin 05.1 at 3-4 (Apr. 5, 2005), https://enforcement.trade.gov/policy/bull05-1.pdf (last visited Dec. 15, 2022).

If, in Commerce's judgment, the information in a separate rate application is insufficient to demonstrate the absence of state control, then Commerce may find that respondent ineligible for a separate rate. *Cf. Jilin*, 45 CIT at __, 519 F. Supp. 3d at 1241 (citation omitted).

For the following reasons, the court concludes that Commerce, in accordance with its policy, did not err in finding that both Scholar Home and Baishan Huafeng failed to demonstrate an absence of both *de jure* and *de facto* state control.

## A.    Scholar Home

On April 2, 2018, Scholar Home filed its separate rate application. *See* Scholar Home's Separate Rate Application (Apr. 2, 2018), PR 172, CR 121-23. Commerce reviewed the separate rate application and identified areas where, in its view, further information was needed to evaluate the company's separate rate eligibility. Commerce found that information regarding Scholar Home's relationship with the State-Owned Assets Supervision and Administrative Commission of the People's Republic of China ("SASAC")[44] was insufficient to demonstrate an absence of control by the Chinese government.

---

[44]    The State-Owned Assets Supervision and Administration Commission of the People's Republic of China is a government agency responsible for managing state-owned entities.

On October 5, 2018, Commerce issued a supplemental questionnaire to Scholar Home asking it to clarify its separate rate application and gave the company a deadline of October 19, 2018, to respond. *See* Scholar Home Separate Rate Application Supp. Quest. (Oct. 5, 2018), PR 343.

Scholar Home failed to timely respond to Commerce's supplemental questionnaire and did not seek an extension. When, on January 29, 2019, the company tried to submit its response, the Preliminary Results had already been filed, and 102 days had passed from the October 19, 2018, deadline. The Department was closed, however, from December 22, 2018, to January 28, 2019, as a result of a partial shutdown of the federal government. The parties agree that Scholar Home should not be penalized for the forty days[45] which the Department was closed. Thus, for purposes of evaluating the timeliness of Scholar Home's supplemental questionnaire response, the court considers the company's response to have been filed sixty-two days after the official deadline.

Here, Commerce rejected Scholar Home's submission as untimely. Consequently, it found that Scholar Home was not eligible to receive a separate rate because the information requested in the supplemental questionnaire was necessary to the Department's separate rate eligibility determination. That is, without the information relating to the role any SASAC may have had in Scholar Home's business operations during the period of review, Commerce concluded that it

---

*See, e.g.*, *Diamond Sawblades Mfrs. Coal. v. United States*, 866 F.3d 1304, 1308 (Fed. Cir. 2017) (referring to "the State-Owned Assets Supervision and Administration Commissions of the State Council of the PRC" as "a Chinese government agency").

[45]     While the government was technically closed for thirty-eight days, the forty-day tolling period takes into account December 21, 2018, because the government was focused on preparing for the shutdown, and January 29, 2019, because the government was focused on resuming operations after the shutdown. *See* Tolling Mem. (Jan. 28, 2019), PR 415.

could not reasonably determine whether the company had demonstrated an absence of state control.

By its motion, Scholar Home now challenges Commerce's rejection of its supplemental questionnaire response by way of two main arguments. First, Scholar Home argues that Commerce abused its discretion in rejecting Scholar Home's supplemental questionnaire response as untimely. *See* Scholar Home's Br. at 22-29. Second, Scholar Home argues that Commerce's finding that the company was ineligible for a separate rate is unsupported by substantial evidence and not in accordance with law because the record contained sufficient information to grant the company a separate rate, even without a response to the Department's supplemental questionnaire. *See* Scholar Home's Br. at 12-21.

### 1.    Commerce Did Not Abuse Its Discretion When It Rejected Scholar Home's Supplemental Questionnaire Response as Untimely

Scholar Home argues that Commerce erred in rejecting the company's supplemental questionnaire response as untimely. Despite Scholar Home's attempt to file its response sixty-two days after the established deadline, and after the Preliminary Results were issued, the company claims that the interests of accuracy and fairness require Commerce to accept the company's untimely response because it would result in a more accurate rate.

The court reviews whether Commerce properly rejected Scholar Home's supplemental questionnaire response as untimely under the abuse of discretion standard. *See Mid Continent Steel & Wire, Inc. v. United States*, 41 CIT __, __, 203 F. Supp. 3d 1295, 1313 (2017) (citation omitted).

"[E]nforcement of time limits[46] and other requirements is neither arbitrary nor an abuse

of discretion when Commerce provides a reasoned explanation for its decision." *Maverick Tube*

*Corp. v. United States*, 39 CIT __, __, 107 F. Supp. 3d 1318, 1331 (2015) (citing *Dongtai Peak*

*Honey Indus. Co. v. United States*, 38 CIT __, __, 971 F. Supp. 2d 1234, 1242 (2014)). Here, as

shall be seen, Commerce provided a reasoned explanation for rejecting Scholar Home's untimely

submission. Thus, its decision was neither arbitrary nor an abuse of discretion.

Commerce rejected Scholar Home's supplemental questionnaire response pursuant to 19

C.F.R. § 351.302(d)[47] because the company neither requested an extension of time nor provided

an adequate justification for its late submission. *See* Final IDM at 55; *see also* 19 C.F.R.

§ 351.302(d) (providing that any information submitted after an applicable deadline will be

considered untimely and may be rejected by Commerce). Scholar Home was given a deadline of

October 19, 2018, to respond to Commerce's supplemental questionnaire. That gave the company

fourteen days from the date of the supplemental questionnaire. Yet, Scholar Home did not attempt

to respond until January 29, 2019—after Commerce issued the Preliminary Decision

Memorandum on December 17, 2018, denying the company a separate rate.

---

[46]     Here, "time limits" refer to the deadlines established by Commerce for submitting information in the administrative review. *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021) (citation omitted).

[47]     "An untimely filed extension request will not be considered unless the party demonstrates that an extraordinary circumstance exists." 19 C.F.R. § 351.302(c). "[Commerce] will not consider or retain in the official record of the proceeding: . . . [u]ntimely filed factual information, written argument, or other material . . . ." *Id.* § 351.302(d)(1).

Scholar Home could have asked for additional time to file its supplemental questionnaire response prior to the original deadline, but it did not do so.[48] As a result, the company not only missed the original deadline, but it also failed to request an extension or explain to Commerce why it was unable to timely respond during the approximately two months leading up to the Department's closure on December 22, 2018. When Commerce finally received Scholar Home's supplemental questionnaire response on January 29, 2019, the company again failed to provide an explanation as to the circumstances preventing its timely filing. Rather, Scholar Home stated that it attempted to file its supplemental questionnaire response "immediately upon . . . realizing that it had received this request." Scholar Home's Br. at 13. A puzzling response.

In this case, Commerce was transparent about its deadlines with the respondent. The supplemental questionnaire was issued on October 5, 2018, and asked Scholar Home, among other things, to clarify whether "any [of its] intermediate or ultimate shareholders are owned or supervised, in full or in part, by the SASAC." *See* Scholar Home Separate Rate Application Supp. Quest. (Oct. 5, 2018), PR 343. The supplemental questionnaire also explicitly stated that Scholar Home's response "must be received no later than 5:00 p.m. on October 19, 2018 [and p]ursuant to 19 C.F.R. § 351.302(d), any information submitted after the applicable deadline will be considered untimely." Scholar Home Separate Rate Application Supp. Quest.

---

[48]     It appears that Scholar Home was aware of the ability to request a deadline extension as it made such a request for the filing of its initial separate rate application, which was due on March 26, 2018. *See* Scholar Home's Separate Rate Application Extension Req. (Mar. 20, 2018), PR 66.

Commerce complied with its obligations under 19 U.S.C. § 1677m(d).[49] *See* 19 U.S.C. § 1677m(d) ("If [Commerce] determines that a response to a request for information under this subtitle does not comply with the request, [it] shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency in light of the time limits established for the completion of [the review] . . . ."). Commerce was clear in its questionnaire informing Scholar Home of the nature of the deficiency in its separate rate application. Commerce also provided the company with an opportunity to remedy or explain the deficiency.

Scholar Home, however, despite being notified on October 5, 2018, of the deficiency in its separate rate application, and having approximately fourteen days to either answer the questionnaire or ask for an extension, ignored Commerce's deadline and failed to answer or request an extension.

Of significance, when the company finally did produce a response, it provided no reason to justify its late submission. Instead, it merely claimed that it answered the questionnaire as soon as it became aware of Commerce's request for additional information regarding certain deficiencies found in the company's separate rate application. One would think that Scholar Home would have become aware of the request when it was made seventy-six days before the company's response. Scholar Home simply made no real effort to explain its delay.

---

[49]     The issue in this case is not whether Scholar Home was denied its statutory rights under 19 U.S.C. § 1677m(d), which requires Commerce to notify and permit a party to remedy or explain any deficiency in information provided during an investigation—an issue recently addressed by the Federal Circuit. *See Hitachi* 34 F.4th at 1384-85. Rather, the issue here is whether Commerce abused its discretion in refusing to accept Scholar Home's untimely supplemental questionnaire response. Therefore, *Hitachi* does not direct the outcome here.

Therefore, because (1) Commerce made clear in its supplemental questionnaire what it considered missing from the separate rate application; (2) Scholar Home failed to answer or request an extension of time prior to the October 19, 2018, deadline; (3) Scholar Home failed to provide any reason whatsoever for filing its response sixty-two days late; and (4) Commerce provided a reasoned explanation for rejecting Scholar Home's untimely submission, the court finds that the Department was not obligated to accept Scholar Home's late submission and did not abuse its discretion in enforcing its deadlines.

### 2. Commerce's Determination That Scholar Home Is Ineligible for a Separate Rate is Supported by Substantial Evidence and in Accordance with Law

Scholar Home argues that, even without its supplemental response, Commerce should grant it a separate rate because the record contains sufficient information for the Department to make its determination. *See* Scholar Home's Br. at 28 (arguing that "there remain[s] extensive information on the record regarding [its] corporate structure and ownership supporting its eligibility for a separate rate"). Thus, for Scholar Home, the Department's determination that the company was ineligible for a separate rate is unsupported by substantial evidence and not in accordance with law.

The company's argument, however, fails to address the concerns identified by Commerce in the supplemental questionnaire. Namely, that Scholar Home reported, in response to question (IV)(A)(1.b) of the separate rate application, that it "has no relationship with any SASAC or government entity" in one part of its separate rate application; yet, in Exhibit 8, reported at least one state-owned enterprise as an intermediate or ultimate shareholder in another part of its separate rate application. *See* Scholar Home's Separate Rate Application at 14, Ex. 8; *see also* Scholar Home Separate Rate Application Supp. Quest.

Because Scholar Home identified a state-owned enterprise as one of its shareholders and failed in its efforts to answer the supplemental questionnaire, Commerce was prevented from determining whether Scholar Home was under state control. It is apparent that Scholar Home erred in reporting that it had "no relationship" with an SASAC. Additionally, because the company did not timely answer the supplemental questionnaire, its answers elsewhere in the separate rate application remain unexplained. Commerce's questions in the supplemental questionnaire bear this out. *See S*cholar Home Separate Rate Application Supp. Quest. ("In response to question IVA.1b., you state that 'Scholar Home has no relationship with any SASAC or government entity.' However, Exhibit 8, which provides a chart entitled 'Information List of the Intermediate and Ultimate Shareholders,' shows [a state-owned entity] as an intermediate or ultimate shareholder of Scholar Home. Explain this discrepancy.").

Therefore, Commerce lacked a clear understanding of the relationship between Scholar Home and the government entity named as one of the company's intermediate or ultimate shareholders. *See* Final IDM at 55 ("Scholar Home's missing information (*i.e.*, its supplemental questionnaire response) was not unrelated and was necessary to determine Scholar Home's independence from the Chinese government. [Thus], there was not enough evidence on the record of this review to determine government control, which is a key purpose of the [separate rate application].").

Because the additional information requested by Commerce is directly related to Scholar Home's relationship with the Chinese government, and therefore was necessary to Commerce's determination, the court concludes that Scholar Home has failed to show by record evidence that the Department erred in denying the company a separate rate.

B.      **Baishan Huafeng**

After reviewing Baishan Huafeng's separate rate application, Commerce determined that necessary information was missing from the record for it to conduct a separate rate eligibility analysis. Accordingly, the Department issued a supplemental questionnaire to Baishan Huafeng, to which the company failed to respond. *See* PDM at 12; *see also* Baishan Huafeng Separate Rate Application Supp. Quest. (Oct. 5, 2018), PR 338, CR 222. Because Baishan Huafeng failed to answer the questionnaire, it was not eligible for a separate rate. Before Commerce, Baishan Huafeng did not file a case brief challenging this determination.

In its supplemental questionnaire, Commerce asked for information about Baishan Huafeng's year-end financial statements for 2017 and articles of association and capital verification reports for the company's key investors and shareholders. *See* Baishan Huafeng Separate Rate Application Supp. Quest. at 2 ("Provide Baishan Huafeng's audited year-end financial statements for 2017 [and] business license[s], articles of association, and capital verification report[s for the named investors/shareholders]."). Commerce was prompted to issue the supplemental questionnaire because it concluded that Baishan Huafeng's financial statements and ownership documentation were essential to determine whether the company was independent of state control. Because Baishan Huafeng failed to provide Commerce with this information, the Department found that the company had failed to demonstrate that it was eligible for a separate rate.

Baishan Huafeng now argues, for the first time before the court, that Commerce's determination that it was not eligible for a separate rate was unsupported by substantial evidence. *See* Baishan Huafeng's Br. at 9.

"The exhaustion doctrine requires a party to present its claims to the relevant administrative agency for the agency's consideration before raising these claims to the Court." *Fabrique de Fer de Charleroi S.A. v. United States*, 25 CIT 741, 743, 155 F. Supp. 2d 801, 805 (2001) (citing *Unemployment Compensation Comm'n of Alaska v. Aragon*, 329 U.S. 143, 155 (1946) (alteration in original) ("A reviewing court usurps the agency's function when it sets aside the administrative determination upon a ground not theretofore presented and deprives the [agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its action.")). Therefore, under the exhaustion doctrine, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014) (quoting *Sandvik Steel Co. v. United States*, 164 F.3d 596, 599 (Fed. Cir. 1998)).

Here, in order to exhaust its administrative remedies, Baishang Huafeng was required to raise the issue of whether it was eligible for a separate rate before Commerce. After the Department preliminarily determined that the company was ineligible for a separate rate, it had the opportunity to challenge the decision through the submission of a case brief. Not only did Baishan Huafeng fail to raise its substantial evidence issue before Commerce, it raised no issue whatsoever by not filing a case brief.

Therefore, because Baishan Huafeng did not raise this argument, or any other argument before Commerce, it has failed to exhaust its administrative remedies and, as a consequence, has abandoned its opportunity to challenge the Department's separate rate eligibility determination before the court.

## CONCLUSION AND ORDER

For the reasons stated above, this matter is sustained in part, and remanded to Commerce for further proceedings in conformity with this Opinion and Order. Thus, it is hereby

**ORDERED** that Commerce shall submit a redetermination upon remand that complies in all respects with this Opinion and Order, is supported by substantial evidence, and otherwise in accordance with law; it is further

**ORDERED** that Commerce must reconsider the method used to select Sino-Maple's AFA rate to comply with the statute, 19 U.S.C. § 1677e(d), consistent with this Opinion and Order; it is further

**ORDERED** that the court reserves decision on the remaining issues until the results of redetermination are before the court; and it is further

**ORDERED** that the remand results shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be due fifteen (15) days following the filing of the comments.

                                                                    ___/s/ Richard K. Eaton___
                                                                              Judge

Dated:          December 22, 2022
                New York, New York