Slip Op. 24–29

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| FUSONG JINLONG WOODEN GROUP CO., LTD. ET AL., | : : : | |
| Plaintiffs, | : : | |
| YIHUA LIFESTYLE TECHNOLOGY CO., LTD. ET AL., | : : : : | |
| Consolidated Plaintiffs, | : : | |
| and | : : | Before: Richard K. Eaton, Judge |
| LUMBER LIQUIDATORS SERVICES, LLC ET AL., | : : : | Consol. Court No. 19-00144 |
| Plaintiff-Intervenors, | : : | **PUBLIC VERSION** |
| v. | : : | |
| UNITED STATES, | : : | |
| Defendant, | : : | |
| and | : : | |
| AMERICAN MANUFACTURERS OF MULTILAYERED WOOD FLOORING, | : : : | |
| Defendant-Intervenor. | : : | |

**OPINION AND ORDER**

[U.S. Department of Commerce's final results are remanded.]

Dated: March 11, 2024

*Alexandra H. Salzman*, deKieffer & Horgan, PLLC, of Washington, D.C., argued for Plaintiffs Fusong Jinlong Wooden Group Co., Ltd., Fusong Qianqiu Wooden Product Co., Ltd., and Dalian Qianqiu Wooden Product Co., Ltd. With her on the brief was *Gregory S. Menegaz* and *J. Kevin Horgan*.

 *Daniel M. Witkowski* and, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, D.C., argued for Consolidated Plaintiff Sino-Maple (Jiangsu) Co., Ltd. With him on the brief was *Matthew R. Nicely* and *Dean A. Pinkert*, Hughes, Hubbard & Reed LLP, of Washington, D.C.

 *David J. Craven*, Craven Trade Law LLC, of Chicago, IL, argued for Consolidated Plaintiffs Huzhou Chenghang Wood Co., Ltd., Hangzhou Hanje Tec Co., Ltd., Hunchun Xingjia Wooden Flooring Inc., Dunhua Shengda Wood Industry Co., Ltd., Zhejiang Fuerjia Wooden Co., Ltd., A&W (Shanghai) Woods Co., Ltd., and Dun Hua Sen Tai Wood Co., Ltd.

 *Adams C. Lee*, Harris Bricken McVay Sliwoski LLP, of Seattle, WA, present but did not argue for Consolidated Plaintiff Zhejiang Dadongwu GreenHome Wood Co., Ltd.

 *Lizbeth Mohan*, Fox Rothschild LLP, of Washington, D.C., argued for Consolidated Plaintiff Baishan Huafeng Wooden Product Co. With her on the brief were *Ronald M. Wisla* and *Brittney R. Powell*.

 *Kavita Mohan*, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for Consolidated Plaintiff Scholar Home (Shanghai) New Material Co., Ltd. With her on the brief were *Elaine F. Wang*, *Francis J. Sailer*, *Ned H. Marshak*, and *Jordan C. Kahn*.

 *Sarah M. Wyss* and *Jill A. Cramer*, Mowry & Grimson, PLLC, of Washington, D.C., present but did not argue for Consolidated Plaintiff Yihua Lifestyle Technology Co., Ltd. Of counsel on the brief was *John R. Magnus*, TradeWins LLC, of Washington, D.C.

 *Gregory S. McCue* and *Adriana M. Campos-Korn*, Steptoe & Johnson, LLP, of Washington, D.C., present but did not argue for Consolidated Plaintiffs Struxtur, Inc. and Evolutions Flooring, Inc.

 *Mark R. Ludwikowski*, Clark Hill PLC, of Washington, D.C., argued for Plaintiff-Intervenor Lumber Liquidators Services, LLC. With him on the brief were *William C. Sjoberg* and *Courtney G. Taylor*.

 *Sonia M. Orfield*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant the United States. With her on the brief were *Joseph H. Hunt*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Tara K. Hogan*, Assistant Director. Of counsel on the brief was *Rachel A. Bogdan*, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, D.C.

 *Stephanie M. Bell*, Wiley Rein LLP, of Washington, D.C. argued for Defendant-Intervenor American Manufacturers of Multilayered Wood Flooring. With her on the brief were *Timothy C. Brightbill*, *Maureen E. Thorson*, and *Tessa V. Capeloto*.

**PUBLIC VERSION**

Eaton, Judge: Before the court are the issues from *Fusong Jinlong Wooden Group Co. v. United States* ("*Fusong I*"), upon which decision was reserved. *See* 46 CIT __, __, 617 F. Supp. 3d 1221, 1227 n.8 (2022). *Fusong I* concerned the final results of the U.S. Department of Commerce's ("Commerce" or the "Department") sixth administrative review of the antidumping duty order on multilayered wood flooring from the People's Republic of China ("China") covering the period of December 1, 2016, through November 30, 2017. *See Multilayered Wood Flooring From the People's Republic of China*, 84 Fed. Reg. 38,002 (Dep't of Commerce Aug. 5, 2019) ("Final Results") and accompanying Issues and Decision Mem. (July 29, 2019), PR 484 ("Final IDM").

In *Fusong I*, Plaintiffs Fusong Jinlong Wooden Group Co., Ltd. et al. ("Fusong"), Consolidated Plaintiffs Sino-Maple (Jiangsu) Co., Ltd. ("Sino-Maple"), Metropolitan Hardwood Floors, Inc. et al. ("Metropolitan Hardwood"), Huzhou Chenghang Wood Co., Ltd. et al. ("Huzhou"), Zhejiang Dadongwu GreenHome Wood Co., Ltd. ("GreenHome"), Yihua Lifestyle Technology Co., Ltd. ("Yihua"), Linyi Anying Co., Ltd. and Linyi Youyou Co., Ltd. (collectively, "Linyi"), Struxtur, Inc. and Evolutions Flooring, Inc. (collectively, "Struxtur"), Scholar Home (Shanghai) New Material Co., Ltd. ("Scholar Home"), and Baishan Huafeng Wooden Product Co. ("Baishan Huafeng"), together with Plaintiff-Intervenors Benxi Wood Company et al. ("Benxi Wood") and Lumber Liquidators Services, LLC ("Lumber Liquidators"), challenged several aspects of Commerce's Final Results as unsupported by substantial evidence and not in accordance with law. *See* Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 51-2 ("Fusong's Br."); Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 57 ("Sino-Maple's Br."); Consol. Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 59-2 ("Metropolitan Hardwood's Br."); Consol. Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 50-1 ("Huzhou's Br."); Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF

**PUBLIC VERSION**

No. 56-2 ("GreenHome's Br."); Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 47-2 ("Yihua's Br.");[1] Consol. Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 53 ("Linyi's Br."); Consol. Pls.' Mem. Supp. Mot. J. Agency R., ECF No. 52 ("Struxtur's Br."); Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 48 ("Scholar Home's Br."); Consol. Pl.'s Mem. Supp. Mot. J. Agency R., ECF No. 60-2 ("Baishan Huafeng's Br."); Pl.-Ints.' Mem. Supp. Mot. J. Agency R., ECF No. 55-2 ("Benxi Wood's Br."); Pl.-Int.'s Mem. Supp. Mot. J. Agency R., ECF No. 54-2 ("Lumber Liquidators' Br.").

Defendant the United States ("Defendant"), on behalf of Commerce, and Petitioner and Defendant-Intervenor American Manufacturers of Multilayered Wood Flooring opposed the motions. *See* Def.'s Resp. Pls.' Mots. J. Agency R., ECF No. 70 ("Def.'s Resp. Br."); Def.-Int.'s Resp. Pls.' Mots. J. Agency R., ECF No. 69.

On December 22, 2022, the court issued its decision in *Fusong I*, which sustained, in part, and remanded, Commerce's Final Results. The court remanded to Commerce the sole issue of whether its use of Jiangsu Senmao Bamboo and Wood Industry Co., Ltd.'s ("Senmao") highest transaction-specific dumping margin as Sino-Maple's adverse facts available ("AFA") rate was authorized by the statute, 19 U.S.C. § 1677e(d). *See Fusong I*, 46 CIT at __, 617 F. Supp. 3d at 1243-46. The court reserved decision on certain challenges to Commerce's calculation of the rate assigned to the respondents not selected for individual examination (the "separate rate"). *See id.* at __, 617 F. Supp. 3d at 1227 & n.8.

After *Fusong I* was issued, but before the remand results deadline, Defendant filed a motion for reconsideration. *See* Def.'s Mot. for Recons. ("Mot. Recons."), ECF No 120. By its motion,

---

[1] On May 22, 2023, the court granted Yihua's attorney's motion to withdraw as counsel. *See* Order (May 22, 2023), ECF No. 134. Yihua has not notified the court of new counsel. Nor has the company shown any interest in continuing with these proceedings.

**PUBLIC VERSION**

Defendant asked the court to revise its *Fusong I* opinion "to hold that Commerce lawfully selected a transaction specific margin pursuant to 19 U.S.C. § 1677e(d)" as Sino-Maple's AFA rate, or, in the alternative, that the court "revise its remand instruction to direct Commerce to provide an explanation of its interpretation of [the statute] prior to [issuing] any redetermination." Mot. Recons. at 16-17. After additional briefing and oral argument, the court granted Defendant's motion and, upon reconsideration, found that "Commerce's method for selecting an adverse facts available rate for Sino-Maple was lawful." Order (Oct. 4, 2023) at 2, ECF No. 145 (granting Mot. Recons.). Since this was the sole issue remanded to Commerce in *Fusong I*, and it was resolved on reconsideration, the court concluded that "the Department [was] relieved of [its] obligation to conduct a remand redetermination and file its results." *Id.*

Plaintiff Fusong, Consolidated Plaintiffs Metropolitan Hardwood, Huzhou, GreenHome, Yihua, Struxtur, and Linyi, together with Plaintiff-Intervenors Benxi Wood and Lumber Liquidators (collectively, the "Separate Rate Companies") are the non-individually examined respondents that challenge Commerce's calculation of the separate rate assigned to them. The Separate Rate Companies argue that (1) Commerce's use of a simple-average method for calculating the separate rate was unlawful under 19 U.S.C. § 1673d(c)(5)(B) and amounts to an unexplained departure from prior agency practice; (2) Commerce's use of Sino-Maple's AFA margin in its separate rate calculation resulted in a rate that is aberrational and not reflective of the non-individually examined separate rate respondents' potential dumping margins; and (3) Commerce's use of Sino-Maple's AFA margin, in calculating the separate rate, violated the excessive fines clause of the Eighth Amendment of the U.S. Constitution. Because the court is remanding the simple-average method used to determine the separate rate, it will not address the latter two arguments pending the outcome of the remand.

**PUBLIC VERSION**

Thus, the court now turns to the remaining issue from *Fusong I* that concerned Commerce's simple-average calculation method. For the reasons discussed below, the court remands, for further explanation or reconsideration, Commerce's use of a simple-average method for determining the separate rate.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction under 28 U.S.C. § 1581(c) (2018) and 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018) and will uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

## BACKGROUND

This opinion presumes familiarity with the facts of the case, as set out in *Fusong I*, and recounts only the facts relevant to the issues from *Fusong I* on which the court reserved decision.

When conducting the underlying administrative review, Commerce determined that "it would not be practicable in light of its resources to individually examine all companies for which an administrative review was initiated," and therefore selected Senmao and Sino-Maple—the two largest exporters of the subject wood flooring by volume—as mandatory respondents.[2] Final IDM at 23. After conducting its review, Commerce determined a 0% rate for Senmao and an 85.13%

---

[2] Commerce initially selected Senmao and Fine Furniture (Shanghai) Limited ("Fine Furniture") as mandatory respondents. *See* Mandatory Respondent Selection Mem. (June 19, 2018) at 8, PR 258, CR 159. It later issued an additional mandatory respondent memorandum stating its intention to rescind the review with respect to Fine Furniture and to select Sino-Maple—the next largest exporter—as a mandatory respondent in its place. *See* Selection of Additional Mandatory Respondent Mem. (July 30, 2018) at 2-3, PR 276.

**PUBLIC VERSION**

rate for Sino-Maple.[3] *See* Final Results, 84 Fed. Reg. at 38,003. Sino-Maple's rate was based entirely on AFA. *See* Final IDM at 12.

Commerce also determined that some of the Chinese exporters and producers not selected for individual review (i.e., the Separate Rate Companies) were eligible for a separate rate by demonstrating both *de jure* and *de facto* independence from the Chinese government.[4] *See id.* at 23 ("Fifty-eight additional exporters remain subject to review as non-individually examined, separate rate respondents."). In other words, the Separate Rate Companies had rebutted the Department's nonmarket economy presumption by establishing their independence from state control.

Commerce took the simple average of Senmao's 0% rate and Sino-Maple's 85.13% AFA rate to arrive at a separate rate of 42.57%. *See* Final IDM at 23. Commerce then assigned the 42.57% rate (the "all-others" rate) to the Separate Rate Companies. *See id.* at 25-26. The Separate Rate Companies argue that Commerce's method for calculating the separate rate is unsupported by substantial evidence and otherwise not in accordance with law.

---

[3]   Commerce preliminarily selected an AFA rate for Sino-Maple of 96.51%, which was the highest transaction-specific margin determined for Senmao—the other mandatory respondent in this review. A review of the record, however, demonstrated that this rate resulted from a clerical error. Thus, in the Final Results, Commerce amended Sino-Maple's AFA rate to reflect the correctly determined highest transaction-specific margin for Senmao, 85.13%. *See* Final IDM at 12.

[4]   "Over the years, Commerce has developed an administrative practice of applying a rebuttable presumption that all companies within a nonmarket economy country are controlled by the government of that country, *i.e.*, the 'NME Policy.'" *Jilin Forest Indus. Jinqiao Flooring Grp. Co. v. United States*, 45 CIT __, __, 519 F. Supp. 3d 1224, 1239 (2021). "As part of its NME Policy, Commerce presumes that all Chinese exporters are part of the 'NME Entity,' a single country-wide concept employed by the Department as a sort of legal fiction." *Fusong I*, 46 CIT at __, 617 F. Supp. 3d at 1231 n.21. "The NME Entity is neither 'China' nor the 'Chinese government,' but rather consists of all the Chinese exporters and producers of subject merchandise. As noted, this policy has been open to question." *Id.* at __, 617 F. Supp. 3d at 1231-32 n.21.

**PUBLIC VERSION**

## LEGAL FRAMEWORK

Where Commerce determines that "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value," it is directed, under the statute, to impose an antidumping duty "in an amount equal to the amount by which the normal value[5] exceeds the export price[6] (or the constructed export price[7]) for the merchandise." 19 U.S.C. § 1673. That excess amount is the "dumping margin." *Id.* § 1677(35); *see also Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1372 (Fed. Cir. 2013).

---

[5] Normal value refers to

> the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i).

[6] Export price refers to

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under [19 U.S.C. § 1677a(c)].

19 U.S.C. § 1677a(a).

[7] Constructed export price refers to

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under [19 U.S.C. § 1677a(c), (d)].

19 U.S.C. § 1677a(b).

The statute directs that Commerce must calculate an individual dumping margin for each known exporter of the subject merchandise during the relevant period of review. *See* 19 U.S.C. §§ 1675, 1677f-1(c)(1). However, if this is not practicable, because of the large number of respondents involved in the review, Commerce may limit its examination to "a reasonable number of exporters" that constitutes either (1) a "statistically valid" representative sample of all known exporters or (2) the exporters "accounting for the largest volume of the subject merchandise from the exporting country." *Id.* § 1677f-1(c)(2).

In proceedings involving nonmarket economy countries, like China, Commerce presumes that the exporters operate under foreign government control and assigns them a single country-wide rate—which is often based on AFA. *See* 19 C.F.R. § 351.107(d); *see also Albemarle Corp. v. United States*, 821 F.3d 1345, 1348 (Fed. Cir. 2016). This presumption is rebuttable, however, and an exporter that demonstrates *de jure* and *de facto* independence from state control may apply to Commerce for a different, separate rate. *See Zhejiang Quzhou Lianzhou Refrigerants Co. v. United States*, 42 CIT __, __, 350 F. Supp. 3d 1308, 1314 (2018) ("Commerce assigns each exporter of subject merchandise a single countrywide rate, unless the exporter requests an 'individualized antidumping duty margin' and 'demonstrate[s] an absence of state control' over its export-related activities, both in law (*de jure*) and in fact (*de facto*)." (citations omitted)). When Commerce limits its examination to fewer than all known exporters under 19 U.S.C. § 1677f-1(c)(2), this separate rate is assigned to all non-individually examined exporters that have demonstrated sufficient independence from state control (i.e., the Separate Rate Companies). *See id.*

While the statute is silent as to how Commerce must determine a separate rate for non-individually examined respondents in administrative reviews, the Department looks to 19

**PUBLIC VERSION**

U.S.C. § 1673d(c)(5) for guidance. This provision states the method for determining an "all-others" rate[8] in an investigation. *See Albemarle*, 821 F.3d at 1352. Section 1673d(c)(5)(A) sets out the "general rule" that the all-others rate assigned to the separate rate respondents is calculated by using the "*weighted average* of the estimated weighted average dumping margins" determined for individually examined companies, "excluding any zero and de minimis margins, and any margins determined entirely under section 1677e of this title [i.e., on the basis of facts available or AFA]." 19 U.S.C. § 1673d(c)(5)(A) (emphasis added).

When the margins calculated for all individually examined respondents are zero, de minimis, or based entirely on facts available or AFA, section 1673d(c)(5)(B) sets out the "exception," which provides that Commerce "may use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated [i.e., the Separate Rate Companies], including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." 19 U.S.C. § 1673d(c)(5)(B) (providing the exception to the general rule under § 1673d(c)(5)(A)).

Simple averaging of dumping margins, however, is not what is expected in situations covered by 19 U.S.C. § 1673d(c)(5)(B). The Statement of Administrative Action, which Congress has approved as an authoritative interpretation of the statute,[9] states that, in accordance with section

---

[8] The "all-others" rate is the rate assigned to all exporters and producers of the subject merchandise in an investigation who were granted separate rate status, but which Commerce did not select as mandatory respondents. *See Shanxi Hairui Trade Co. v. United States*, 39 F.4th 1357, 1360 (Fed. Cir. 2022).

[9] "The statement of administrative action approved by the Congress under section 3511(a) of this title shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

**PUBLIC VERSION**

1673d(c)(5)(B), "[t]he *expected method* in . . . cases [where all the rates for the individually examined respondents are zero, de minimis, or determined entirely on the basis of facts available or AFA] will be to *weight-average* the zero and *de minimis* margins and margins determined pursuant to the facts available [or AFA], provided that volume data is available." Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-316 at 873 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4201 (emphasis added).

Thus, when, in an administrative review, Commerce is unable to calculate a rate for the separate rate respondents using the general rule set out in § 1673d(c)(5)(A), the SAA's "expected method" becomes the default calculation method. *See PrimeSource Bldg. Prods., Inc. v. United States*, 46 CIT __, 581 F. Supp. 3d 1331, 1337-38 (2022). In other words, in an administrative review, when the margins calculated for the mandatory respondents are zero, de minimis, or based entirely on facts available or AFA, Commerce is expected to weight average, by volume,[10] these rates, to determine the rate for the Separate Rate Companies.

Weight averaging aids Commerce in its primary goal of determining "dumping margins as accurately as possible" for the non-individually examined respondents by calculating an antidumping rate that better reflects the actual experience of those respondents. *See generally Yangzhou Bestpak*, 716 F.3d at 1379 ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible." (citation omitted)). This Court has stated, in another context (concerning Commerce's calculation of benchmark prices), that using a weighted-average method, if possible, is preferable to using a simple-average method. Thus, in *Icdas Celik Enerji Tersane ve Ulasim Sanayi, A.S. v. United States*, this Court

---

[10] "Commerce uses *quantity/volume* data, not *sales values*, to weight-average respondent rates." *Pro-Team Coil Nail Enter., Inc. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1281, 1293 n.12 (2021).

explained that when calculating a benchmark price, it is preferable to use a weighted-average method because doing so will not "introduce[e] the distortions that naturally result from using a simple average." 41 CIT __, __, 277 F. Supp. 3d 1354, 1357 (2017). In fact, Commerce itself has stated that "[u]sing weighted-average prices where possible reduces the potential distortionary effect of any specific transaction (*e.g.*, extremely small transactions) in the data." *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41,964 (Dep't of Commerce July 18, 2014) and accompanying Issues and Decision Mem. at cmt. 4.

It may be that Commerce could find, when applying the exception under § 1673d(c)(5)(B), that it cannot use the "expected method." This Court has held that, in such cases, "the burden of proof lies with the party [i.e., Commerce] seeking to depart from the expected method." *PrimeSource*, 46 CIT at __, 581 F. Supp. 3d at 1338. Thus, "Commerce may depart from the 'expected method' and use 'any [other] reasonable method,' but only if [it] reasonably concludes that the expected method is not feasible or results in an average that would not be reasonably reflective of potential dumping margins [for the separate rate respondents]." *Linyi Chengen Imp. & Exp. Co. v. United States*, 44 CIT __, __, 487 F. Supp. 3d 1349, 1356-57 (2020) (citations omitted). "Commerce must determine that the expected method is not feasible or would not be reasonably reflective of the potential dumping margins for non-investigated exporters or producers based on substantial evidence." *Id.* at __, 487 F. Supp. 3d at 1357. Naturally, in order for a court to determine if Commerce has acted reasonably, the Department must provide the reasons for its actions.

**PUBLIC VERSION**

## DISCUSSION

At issue is whether the Department's chosen method for determining the Separate Rate Companies' rate, by taking a simple average of the two individually examined mandatory respondents' dumping rates—a 0% rate and an 85.13% rate (based entirely on AFA)—is supported by substantial evidence and otherwise in accordance with law.

I. **Commerce Departed from the Expected Method When It Calculated the Separate Rate by Taking a Simple Average of Senmao's and Sino-Maple's Margins**

As an initial matter, Commerce claims that it used the "expected method" when it calculated the separate rate by taking "the *simple average* of the zero percent rate calculated for Jiangsu Senmao and the 85.13 AFA rate for Sino-Maple." Def.'s Resp. Br. at 38 (emphasis added) ("[I]n accordance with the 'expected method' for calculating a separate rate margin, Commerce assigned to all eligible non-selected respondents the simple average of the zero percent rate calculated for Jiangsu Senmao and the 85.13 AFA rate for Sino-Maple, or 42.57 percent.").

Commerce's claim is not quite right. As explained above, the "expected method" is the default method that Commerce is "expected" to follow when determining a separate rate under the "any reasonable method" exception to the general rule set forth in 19 U.S.C. § 1673d(c)(5)(A). *See* 19 U.S.C. § 1673d(c)(5)(B); *see also* SAA at 873. Under the expected method, Commerce shall "*weight-average* [by volume] the zero and the *de minimis* margins and margins determined pursuant to the facts available [or AFA], *provided that volume data is available*." SAA at 873 (emphasis added). Here, Commerce took a *simple average* of the mandatory respondents' zero and AFA margins. This is a departure from the expected method, which calls for a *weighted-average* calculation. *See id.*; *see also Pro-Team Coil Nail Enter., Inc. v. United States*, 46 CIT __, __, 587 F. Supp. 3d 1364, 1370 n.7 (2022), *appeal docketed*, No. 22-2241 (Fed. Cir. Sept. 22, 2022) ("By

using the simple average, Commerce diverged from the expected method, which calls for using the weighted average of the selected respondents' rates.").

Thus, despite Commerce's assertion that it followed the expected method, it did not actually do so.

II. **Commerce's Departure from the Expected Method Is Remanded for Further Explanation or Reconsideration**

When Commerce departs from the expected method, it must show, as supported by substantial record evidence, that calculating the separate rate using the expected method is not "feasible or [would result] in an average that would not be reasonably reflective of potential dumping margins for [the separate rate respondents]." *Linyi Chengen Imp. & Exp. Co.*, 44 CIT at __, 487 F. Supp. 3d at 1356-57; *id.* at __, 487 F. Supp. 3d at 1357 ("Commerce must determine that the expected method is not feasible or would not be reasonably reflective of the potential dumping margins for non-investigated exporters or producers based on substantial evidence." (citation omitted)). Here, Commerce found that using a weighted average of the mandatory respondents' margins (i.e., the expected method) was not feasible because "volume data were not available for the mandatory respondent that failed to cooperate." Final IDM at 27. That is, for Commerce, using the expected method was not feasible because the volume data for Sino-Maple, which would be necessary for a weighted-average calculation, was incomplete.[11] *See id.* at 8, 25.

Although Commerce maintains that volume data was unavailable for Sino-Maple because the company failed to report some of its U.S. sales, the record is not entirely devoid of information

---

[11] Commerce determined that the volume data for Sino-Maple was incomplete for the same reasons it applied AFA, i.e., because Sino-Maple failed to report some of its U.S. sales with respect to one of its U.S. affiliates, Alpha Floors. *See* Final IDM at 8, 25; *see also* Sino-Maple Preliminary Adverse Facts Available Mem. (Dec. 17, 2018), PR 409, CR 270.

**PUBLIC VERSION**

from which the Department might determine Sino-Maple's U.S. sales volumes for purposes of calculating a weighted average. During the review, Commerce issued quantity and value questionnaires to the thirty largest producers/exporters, by volume, of subject entries. *See* Mandatory Respondent Selection Mem. (June 19, 2018) at 6-7, PR 258, CR 159. This data was broken down by exporter, and Commerce relied on it when selecting the mandatory respondents. *Id.* at 10, attach. Sino-Maple was one of the companies that was issued a quantity and value questionnaire, to which it timely responded. *See* Sino-Maple's Resp. Q & V Quest. (May 28, 2018), CR 127. The company included in its response the total quantity (in both cubic meters and kilograms) and value (in U.S. dollars) for its U.S. sales of the merchandise during the relevant period of review. *Id.* attach. I.

While Commerce maintains that volume data was not available for Sino-Maple, it did not explain why the company's reported quantity information, which the Department found reliable for mandatory respondent selection purposes, was not also reliable for calculating a weighted average under the expected method for determining the rate assigned to the Separate Rate Companies. *See, e.g.*, *Pro-Team Coil Nail Enter., Inc. v. United States*, 45 CIT __, __, 532 F. Supp. 3d 1281, 1293-94 (2021) (remanding Commerce's use of a simple average to determine the rate for non-individually investigated companies, where Commerce "did not explain why the Customs data [on the record], which were reliable for purposes of respondent selection, were not also reliable for purposes of using the 'expected method'").

The court is aware that although much quantity information was on the record, the volume data in Sino-Maple's response to Commerce's quantity and value questionnaire did not represent the entirety of the company's U.S. sales during the period of review. As discussed in more detail in *Fusong I*, Sino-Maple identified certain sales that it had not initially reported, which the

company, upon consulting legal counsel, later believed to be subject to antidumping duties in the administrative review.[12] *See Fusong I*, 46 CIT at __, 617 F. Supp. 3d at 1229-30. Sino-Maple provided Commerce with the total aggregate *quantity* and value for the unreported sales but requested additional time to report the sales value information on an individual (per transaction) basis. *Id.* at __, 617 F. Supp. 3d at 1230-31. Commerce denied Sino-Maple's request for extra time. *Id.* at __, 617 F. Supp. 3d at 1230. Nonetheless, the aggregate *quantity* information for these sales were placed on the record.

It is, of course, true that the court, in *Fusong I*, stated that "[a]lthough Sino-Maple reported the *total aggregate quantity* and value for the missing U.S. sales, that information was of little worth to Commerce's antidumping duty determination because the company failed to report the sales [value] data for each of the individual entries that compose the aggregate." *Id.* at __, 617 F. Supp. 3d at 1235 (emphasis added). In other words, the court upheld Commerce's decision to disregard Sino-Maple's reported U.S. sales information in favor of using facts available because the transaction-specific U.S. sales value data was necessary to Commerce's calculation of Sino-Maple's individual rate. *Id.* at __, 617 F. Supp. 3d at 1235-36.

While the transaction-specific sales value data for the unreported sales was necessary to Commerce's calculation of an individual rate for Sino-Maple, it does not appear to have been necessary for Commerce to use for the expected method (i.e., a weighted average by quantity/volume of Senmao's and Sino-Maple's rates) when calculating the rate for the Separate Rate Companies. Rather, the aggregate quantity or "volume" data for Sino-Maple's unreported

---

[12] "[A]fter reviewing certain sales with its counsel, Sino-Maple wished to report additional imports into the United States by [its affiliate] Alpha Floors of multilayered wood flooring from a third-country manufacturer as constructed export price sales." *Fusong I*, 46 CIT at __, 617 F. Supp. 3d at 1229.

sales, along with the import volumes from its quantity and value questionnaire response, both of which were placed on the record, would seem to be sufficient to employ the expected method. In fact, Commerce provided a chart with a breakdown of the total import quantity information for both Sino-Maple's reported and unreported U.S. sales during the period of review.[13] Commerce claims that it could not calculate a weighted average of Senmao's and Sino-Maple's margins using the expected method because "the volume data for Sino-Maple [was] incomplete, and therefore, unusable for purposes of calculating a weighted-average." Final IDM at 25. Yet, Commerce appears to have placed on the record the information it claims is missing.

Further, Commerce suggests that it was not required to explain why it departed from the expected method but needed merely state a reason without further explanation. Having stated its reason (that usable volume information was missing from the record), the Department submits it was not required to provide an explanation because the path to its decision was reasonably discernable. *See* Def.'s Resp. Br. at 49 ("To the extent Commerce did not explicitly articulate why it departed from using a weighted average, its 'path . . . may be reasonably discerned.'" (citation omitted)). Thus, Commerce claims that stating that "volume data for Sino-Maple are incomplete, and therefore, unusable for purposes of calculating a weighted-average," without more, fulfills any obligation to legally justify its departure from the expected method. This, however, is not the law. As noted, this Court has held that the Department must adequately explain its reasons for departing

---

[13]    The breakdown of Sino-Maple's "reported" and "unreported" U.S. sales for the relevant period of review, found in Sino-Maple Preliminary Adverse Facts Available Mem. at 3, is as follows:

| Amounts | Reported | Unreported |
|---|---|---|
| Quantity (m2) | 515,766 | 211,757 |
| Value (USD) | $12,437,253 | $5,301,981 |
| Percentage | 71% | 29% |

from the expected method for the departure to be supported by substantial evidence. Here, for instance, an explanation would include why Commerce did not use the volume information on the record. *See, e.g.*, *Pro-Team Coil Nail Enter., Inc.*, 45 CIT at __, 532 F. Supp. 3d at 1293-94 (remanding, on substantial evidence grounds, where Commerce "did not explain why the Customs data [on the record], which were reliable for purposes of respondent selection, were not also reliable for purposes of using the 'expected method' for determining the rate for non-individually investigated companies"); *Linyi Chengen Imp. & Exp. Co.*, 44 CIT at __, 487 F. Supp. 3d at 1359 (concluding "that Commerce's explanations, without citations to any credible record documents, do not rise to the level of substantial evidence required to support Commerce's departure from the expected method and apply the 'any reasonable method' exception in 19 U.S.C. § 1673d(c)(5)(B)").

The court finds that Commerce has not adequately explained its reason for departing from the expected method. Moreover, the Department has not supported with substantial evidence its finding that "volume data for Sino-Maple [was] incomplete." Final IDM at 25. As mentioned, Commerce did not explain why Sino-Maple's reported sales volume data, which the Department found reliable for mandatory respondent selection purposes, was not also reliable for calculating a weighted average under the expected method. Nor did Commerce explain why it could not rely on the chart that it created, which was derived from record evidence and placed on the record— depicting the total volume of Sino-Maple's reported and unreported U.S. sales during the period of review. As such, the court cannot see how Commerce's statements (1) comply with the law or (2) are supported by substantial evidence.

The court thus remands the issue of the "expected method." Because the remaining issues (i.e., whether Commerce's use of Sino-Maple's AFA margin in its separate rate calculation

resulted in a rate that is aberrational and not reflective of the Separate Rate Companies' potential dumping margins and amounts to an excessive fine or penalty under the Eighth Amendment) are dependent on Commerce's reconsideration of its calculation of the separate rate on remand, the court reserves decision on these matters until the results of redetermination are before the court.

## CONCLUSION AND ORDER

For the reasons stated above, this matter is remanded to Commerce for further proceedings in conformity with this Opinion and Order. Thus, it is hereby

**ORDERED** that Commerce shall submit a redetermination upon remand that complies in all respects with this Opinion and Order, is supported by substantial evidence, and otherwise in accordance with law; it is further

**ORDERED** that Commerce must explain, and support with substantial evidence, its decision to use a simple average of Senmao's 0% rate and Sino-Maple's 85.13% rate as the rate assigned to the Separate Rate Companies. If Commerce finds it cannot do so, it shall reconsider its decision to depart from the expected method; it is further

**ORDERED** that the court reserves decision on the remaining issues until the results of redetermination are before the court; and it is further

**ORDERED** that the remand results shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be due fifteen (15)

**PUBLIC VERSION**

days following the filing of the comments.

                                          /s/ Richard K. Eaton
                                                      Judge

Dated:       March 11, 2024
              New York, New York

**PUBLIC VERSION**